PEOPLE v TYBURSKI

Docket No. 122380. Submitted June 2, 1992, at Detroit. Decided
    November 2, 1992, at 9:30 A.M. Leave to appeal sought.

Leonard Tyburski was convicted by a jury in the Wayne Circuit
    Court, Richard P. Hathaway, J., of second-degree murder of his
    wife following a highly publicized discovery of her body in a
    freezer in the basement of their home. The defendant appealed,
    challenging the procedure employed by the trial court in con-
    ducting voir dire, particularly with respect to the adequacy of
    inquiry into the veniremen's knowledge of pretrial publicity
    and its effect on their impartiality.

The Court of Appeals held:

1. The trial court's refusal to conduct voir dire of each
venireman outside the presence of other veniremen or to allow
the submission of written questionnaires to each venireman
separately did not deprive the defendant of his right to an
impartial jury under the Sixth Amendment, or his right to due
process under the Fourteenth Amendment.

2. The manner in which voir dire is to be conducted in a case
is within the discretion of the trial court. However, it is well
established common law in Michigan that a trial court abuses
its discretion when it limits the scope of voir dire in a manner
that prevents the development of a factual basis for the exer-
cise of challenges for cause or peremptory challenges. In this
case, the trial court's voir dire was a perfunctory exercise
rather than the probing inquiry necessary in a highly publi-
cized case to elicit sufficient information from which counsel
could make an informed decision with respect to challenges for
cause or peremptory challenges.

Reversed and remanded for a new trial.

SAWYER, P.J., dissenting, stated that the defendant had a
right to a fair trial, not a perfect trial, and that, although the
trial court's voir dire could have been more extensive, the trial

REFERENCES
Am Jur 2d, Criminal Law § 841; Jury §§ 200-202.
See the ALR Index under Criminal Procedure Rules; Jury and Jury
    Trial; Peremptory Challenges; Voir Dire.

court did not abuse its discretion in conducting voir dire as it did.

CRIMINAL LAW — JURY — VOIR DIRE.

The scope of voir dire is left to the discretion of the trial court; however, the court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of challenges for cause or peremptory challenges.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Janice M. Joyce Bartee,* Assistant Prosecuting Attorney, for the people.

*F. Randall Karfonta,* for the defendant.

Before: SAWYER, P.J., and MURPHY and L. P. BORRELLO,* JJ.

MURPHY, J. Following a jury trial, defendant was convicted as charged of second-degree murder, MCL 750.317; MSA 28.549. He was sentenced to serve twenty to forty years in prison. He now appeals as of right.

This case arises from defendant's killing of his wife on September 28, 1985. This fact is not in dispute. The case has received a great deal of publicity because of the unusual manner in which defendant disposed of the body: he stored it in a chest freezer in his basement for over three years. The body was discovered by his elder daughter on January 2, 1989.

Defendant admits killing his wife, Dorothy Tyburski, but claims that it was not murder but a killing in the heat of passion, thus manslaughter,

* Circuit judge, sitting on the Court of Appeals by assignment.

or that he killed in self-defense.[1] Defendant admitted the killing in his own testimony. He stated that his wife told him that she wanted him to leave for a couple of weeks and that she no longer loved him. Defendant replied that he still loved her and refused to leave. He then asked the victim whether she was having an affair with the eighteen-year-old boyfriend of their elder daughter. The victim refused to answer. She grabbed a knife and fork and went downstairs to get something out of the freezer. Defendant followed her to continue the conversation.

In the basement, the victim took some plastic containers out of the freezer. Defendant again asked her if she was having an affair with their daughter's boyfriend. The victim responded with words to the effect of, "Yes, I am. I love Craig. He's a man. You're not a man. You're a wimp, a punk, a bastard. You're leaving. Get out of here." The victim threw the frozen food containers, along with the knife and fork, at defendant as she said the words.

The victim came at defendant with her hands. Defendant pushed her away. The victim retrieved the knife and lunged at him with it. Defendant stated that he was in shock at this point over learning of the affair and afraid because of the physical attack. After he stopped the victim from stabbing him, he slammed her head into a beam many times. He then flung her into the freezer. He went upstairs, cleaned up, and returned to the basement a half-hour later. He noticed that the

---

[1] Although these defenses are seemingly incompatible, defense counsel did a fine job at trial of presenting them in a way to make them compatible. In essence, it was argued that defendant was already in the heat of passion when his wife attacked him with a steak knife. Thus, if his response to the attack was excessive, and thus not self-defense, the killing was mitigated to manslaughter because of the heat of passion.

victim was motionless and was not breathing. At this point, he closed the freezer and never opened it again.

The evidence presented by the prosecutor established that the victim, in fact, had sexual relations with her daughter's boyfriend. Specifically, there was an incident during which the victim performed fellatio on her daughter's boyfriend in an automobile, as well as a subsequent incident in which they engaged in sexual intercourse. The victim also made additional sexual overtures to the boyfriend in the weeks preceding her death, which the boyfriend resisted.

Furthermore, the boyfriend and both of defendant's daughters testified that the victim spent increasing amounts of time with the boyfriend and the elder daughter, as well as time with the boyfriend alone. The younger daughter described the relationship between her sister, the boyfriend, and the victim as "like three teenagers." The boyfriend described the victim as acting more like his friend than like his girl friend's mother.

Additionally, the prosecutor presented evidence that there had been marital problems between the victim and the defendant, particularly after the death of the victim's sister approximately 1½ years before the victim's death. Apparently it was not unusual for the victim to throw objects at defendant and to leave home for days at a time.

The prosecutor also presented evidence that defendant had developed an elaborate story to explain the victim's disappearance. The defendant told family members and the police that the victim left him and had moved out of the house. He described supposed contacts with her over the course of several months after her disappearance. Additionally, defendant had apparently com-

menced divorce proceedings as the logical culmination of his cover-up.

As for the cause of death, the medical examiner testified that the victim died of blunt-force trauma to the head. He testified that the injuries were inflicted by hitting the victim's head into a blunt object, rather than vice versa. The medical examiner described a minimum of eleven blows to the head. Finally, the medical examiner ruled out suffocation as a cause of death. Thus, the victim was dead before defendant closed the freezer.

Defendant first argues that he was denied his rights under the federal and state constitutions to an impartial jury and due process because the trial court erred in the manner in which it handled voir dire of the jury.[2] The request of defendant's attorney to personally conduct the voir dire was denied by the trial court. Defendant had also requested that voir dire be sequestered (i.e., each venireman to be examined outside the presence of the rest of the venire) and that there be extensive inquiry into the exposure of the potential jurors to the extensive media coverage of the case.[3] Defendant had suggested that the inquiry take the form of a written questionnaire to each potential juror, which defendant had submitted, so as not to taint the rest of the panel.

There are no hard and fast rules governing what the trial court is obligated to do during voir dire. This Court recently stated the following regarding voir dire:

---

[2] US Const, Ams VI, XIV; Const 1963, art 1, § 20.

[3] The case attracted international media attention, largely due to the fact that the victim's body had been kept in the freezer for three years. An indication of the extensive pretrial publicity in this case was evidenced by the fact that over forty potential jurors were called for questioning and all but two acknowledged that they had been exposed to various forms and amounts of the pretrial publicity.

The scope of voir dire is left to the discretion of the trial court. *People v Harrell,* 398 Mich 384, 388; 247 NW2d 829 (1976). However, a trial court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of peremptory challenges. *People v Mumford,* 183 Mich App 149, 155; 455 NW2d 51 (1990). [*People v Taylor,* 195 Mich App 57, 59; 489 NW2d 99 (1992).]

Turning first to the issue of the sequestered voir dire, we have carefully reviewed the voir dire transcript. We do not believe that anything said during voir dire served to taint the venire. However, we do not dismiss the propriety of a sequestered voir dire in certain cases. The concerns raised by defendant were very real, and defendant's request was certainly not frivolous. There was a real danger in this highly publicized case that statements made during the voir dire could have tainted the rest of the panel, necessitating a mistrial. To this extent, the trial court took a risk in refusing to engage in a sequestered voir dire. We are, however, afforded the luxury of being able to review the issue with the benefit of hindsight and determine whether the venire was actually tainted. We are satisfied that nothing was said that actually served to taint the venire, although we do express concern that in highly publicized cases the mere fact that the jury panel is exposed to the dismissal of a number of potential jurors who are dismissed for cause by the court on its own motion could adversely influence remaining jurors by conveying to them the community's perception of the case, including the guilt of the defendant. Thus, we believe that in highly publicized cases, the jury selection method must be more sensitive to the fact that veniremen with personal knowledge from adverse media exposure

may taint the rest of the jury panel. In such cases, the trial court may find it appropriate to first determine which veniremen have been exposed to the adverse publicity. If one or all of the veniremen have been exposed, then the trial court must make a discretionary decision whether to conduct sequestered voir dire so as to prevent answers or perceptions from tainting the remainder of the venire. After the veniremen have been subjected to voir dire individually regarding their media exposure, then sequestration may no longer be necessary. While we have the benefit of hindsight in this case, it represents a good example of where sequestered voir dire may have been appropriate.

The other issue with respect to the voir dire, whether there was sufficient inquiry of the veniremen by the court, is not so easily disposed of. The trial court chose to conduct the voir dire itself rather than have the attorneys conduct it. Although such a decision is within the court's discretion, it should be made cautiously, as this case demonstrates. Defendant's attorney, because she could not participate in the voir dire questioning, submitted an extensive list of questions to be posed to the venire. The questions were largely ignored by the court. While the court was scrupulous in excusing sua sponte any venireman who acknowledged having formed opinions on the basis of the media reports of the case,[4] it failed to ask those

_____
[4] The trial court dismissed sua sponte eighteen veniremen, nine because they had formed opinions on the basis of media exposure, four who knew defendant or witnesses, two because they stated they were biased against the police, one who was biased against the court system, one because of religious beliefs (she was a Jehovah's Witness), and one because she stated she could not be fair because of the fact the victim's body was placed in a freezer. Those veniremen who were dismissed on the court's own motion because they had formed opinions effectively *volunteered* that pretrial media exposure would prevent them from being fair to the defendant. While such dismissal may well be appropriate, we do not subscribe to a jury selection procedure

who had not probing questions regarding the extent and nature of their media exposure and largely accepted at face value their word that they had not formed opinions. For those who had formed opinions, the court did not inquire regarding what opinions had been formed, but again scrupulously dismissed any juror who *voluntarily admitted* an inability to be fair to defendant. Defendant now asserts that by failing to provide a sufficient inquiry of the veniremen, the trial court interfered with his ability to exercise his challenges for cause and his peremptory challenges.[5]

With respect to defendant's challenge that the process violated the United States Constitution, our review is controlled by the recent decision in *Mu'min v Virginia,* 500 US —; 111 S Ct 1899; 114 L Ed 2d 493 (1991). In *Mu'min,* the United States

that effectively makes the potential juror the determiner of whether the juror should appropriately serve as a venireman in the case. Further, a potential juror's self-analysis concerning whether the juror formed an opinion need not necessarily control the determination of the juror's impartiality; rather, that determination is reserved for the trial judge after sufficient inquiry.

[5] We note that defendant did not exhaust his peremptory challenges. Generally, to preserve for appeal a question of jury selection, a party must exhaust its peremptory challenges. *People v Taylor,* 195 Mich App 57; 489 NW2d 99 (1992). However, when a party refuses to express satisfaction with the jury empaneled, the issue is preserved for appeal. *Id.* at 60. ("Requiring defendant to unintelligently exercise them [peremptory challenges] would be pointless, because it could not have prevented the error, eliminated its prejudice, or further demonstrated the error and its prejudice.") Defendant's attorney preserved this issue for appeal by clearly stating her objections and dissatisfaction with the jury panel and moving for a mistrial before commencement of the actual trial:

I did not exercise all of the preemptory [sic] challenges. I was careful to say in closing yesterday not that I was satisfied with the juror [sic] panel but that I was not going to exercise on behalf of Mr. Tyburski any further pre-emptories [sic]. I don't believe that using pre-emptories [sic] would have cured the Court's procedure here. And I am not satisfied that this is an impartial jury.

We picked the best jury we could under the circumstances here.

Supreme Court addressed the merits of whether a restriction of voir dire that interferes with the exercise of peremptory challenges is unconstitutional under the Sixth Amendment, which guarantees the right to an impartial jury, and the Due Process Clause of the Fourteenth Amendment. In *Mu'min,* the defendant, while serving time for first-degree murder, committed another murder after escaping while out of prison on a work detail. Because the case generated extensive publicity in the local news media, defense counsel submitted to the trial court proposed voir dire questions regarding the content of news reports to which the veniremen had been exposed. The trial court refused to ask any of the proposed questions. The Supreme Court of Virginia affirmed the trial court's decision. The United States Supreme Court also affirmed, finding that, while inquiries into the content of any news reports that a potential juror has read might be of some benefit in exercising peremptory challenges, such challenges are not required by the federal constitution and thus no constitutional violation occurred. 114 L Ed 2d 505.

In accordance with *Mu'min,* we believe that, while the concerns raised by defendant are very real,[6] the trial court's refusal to employ defendant's questionnaire or ask in-depth or probing questions regarding the media exposure did not violate his right under the Sixth Amendment to an impartial jury or his right to due process under the Fourteenth Amendment of the United States Constitution.

With respect to defendant's similar challenges under the Michigan Constitution, we do not think it necessary to determine whether the procedure

---

[6] The dissent in *Mu'min, supra,* illustrates most particularly the merit of allowing deeper inquiry into pretrial publicity exposure of the venireman.

utilized violated our state constitution. It is well established common law in Michigan that a trial court abuses its discretion when it so limits voir dire as to exclude an adequate showing of facts that could be employed in exercising challenges for cause and peremptory challenges. This common law was annunciated in *Fedorinchik v Stewart*, 289 Mich 436, 438-439; 286 NW 673 (1939), where our Supreme Court stated:

> It is indispensable to a fair trial that a litigant be given a reasonable opportunity to ascertain on the voir dire whether any of the jurors summoned are subject to being challenged for cause or even peremptorily. *In a large measure the scope of examination of jurors on voir dire is within the discretion of the trial judge; but it must not be so limited as to exclude a showing of facts that would constitute ground for challenging for cause or the reasonable exercise of peremptory challenges. So to limit the examination is an abuse of discretion.* [Emphasis added.]

Since *Fedorinchik,* a number of cases from this Court have applied this common-law concept to criminal matters and have similarly held that, while the scope of voir dire is within the discretion of the trial court, the court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of challenges for cause and peremptory challenges. See *Taylor, supra* at 59 ("a trial judge may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of peremptory challenges"); *People v Mumford,* 183 Mich App 149, 155; 455 NW2d 51 (1990) ("the trial court may not restrict the scope of voir dire in a manner which prevents the development of a factual basis for the exercise of peremptory challenges"); *People v Fur-*

*man,* 158 Mich App 302, 322; 404 NW2d 246 (1987) ("the purpose of voir dire is to give counsel the opportunity to develop a rational basis for exercising both challenges for cause and peremptory challenges"); *People v Vesnaugh,* 128 Mich App 440, 444; 340 NW2d 651 (1983) ("the purpose of voir dire of prospective jurors is to afford counsel the opportunity to develop a rational basis for exercising both challenges for cause and peremptory challenges"); *People v Pawelczak,* 125 Mich App 231, 243; 336 NW2d 453 (1983) ("the purpose of voir dire is to afford counsel an opportunity to develop a rational basis for excluding jurors for cause or by peremptory challenge"); *People v Larry Smith (After Remand),* 122 Mich App 202, 207; 332 NW2d 401 (1981) ("the purpose of voir dire is to afford counsel an opportunity to elicit sufficient information to develop a rational basis for excluding jurors for cause or by peremptory challenge"); *People v Sears,* 88 Mich App 1, 3; 276 NW2d 496 (1979) ("[voir dire] must not be so limited as to exclude a showing of facts that would constitute ground for challenging for cause or the reasonable exercise of peremptory challenges"); *People v Hoffmeister,* 52 Mich App 219, 222; 217 NW2d 58 (1974) ("the trial judge, however, must not so limit the voir dire as to exclude an adequate showing of facts to give defense counsel grounds to challenge potential jurors both peremptorily or for cause"); *People v Milkovich,* 31 Mich App 582, 585; 188 NW2d 124 (1971) ("parties are entitled to reveal substantial prejudices which veniremen may possess and have the right to develop a rational basis for the exclusion of prospective jurors"); *People v Cole,* 8 Mich App 250, 254; 154 NW2d 579 (1967), rev'd on other grounds, 382 Mich 695; 172 NW2d 354 (1969) ("the purpose of the voir dire examination is to enable the attor-

neys to elicit such information as to develop a
rational basis for the exercise of challenges for
cause or peremptory challenges").

In this case, the trial court initially presented
some probing questions into the extent of the
veniremen's familiarity with the publicity genera-
ted by this case. As the questioning process contin-
ued and new veniremen replaced those who were
excused, however, the questions became less and
less probing. A review of questions posed indicates
that, as voir dire continued, the trial court did
nothing more than inquire into whether the veni-
remen had been subjected to media exposure and,
if so, whether they had formulated any opinions
regarding the matter.[7] These questions were con-

---

[7] Some typical examples of the questions posed by the trial court
regarding media exposure are as follows:

*The Court:* Have you heard or read something about this
case?
*Juror Louis:* TV and the newspaper.
*The Court:* Have you developed any opinions as to what
you've read?
*Juror Louis:* Sort of.
*The Court:* All right. Why do you say sort of?
*Juror Louis:* Well, I read the paper, you know, you pick it up.
It's news.
*The Court:* Okay. Do you understand that if you are selected
to sit as a juror in this case that you have to decide the case on
what you hear in the courtroom?
*Juror Louis:* Yes.
*The Court:* And will you be able to do that?
*Juror Louis:* Yes.
*The Court:* Will you be able to set aside the opinions that
you've developed in newspapers and judge this case on what
you hear in the courtroom?
*Juror Louis:* Yes.

*   *   *

*The Court:* Ms. Palmer, have you heard about this case?
*Juror Palmer:* Yes, I have.
*The Court:* How is it that you heard about this case?
*Juror Palmer:* On the news, read the paper.
*The Court:* Okay. Have you developed any opinions that
would make you an unfair juror?

*Juror Palmer:* No.

\*   \*   \*

*The Court:* Have you ever heard about this case?

*Juror Rae:* Yes, your Honor.

*The Court:* And how is it that you heard about this case?

*Juror Rae:* I think I recall a television newscast.

*The Court:* All right. Did you hear my statement that this case will be decided in the courtroom rather than by the media?

*Juror Rae:* Yes, your Honor.

*The Court:* Have you developed any opinions that would make you an unfair juror?

*Juror Rae:* No.

\*   \*   \*

*The Court:* And how have you heard about this case?

*Juror Caldwell:* Just the newspapers, sir.

*The Court:* Did you read that magazine article that I held up earlier?

*Juror Caldwell:* No, sir.

*The Court:* Okay. As a result of what you have read in the newspaper, have you developed any opinions that would make you an unfair juror?

*Juror Caldwell:* No, sir.

\*   \*   \*

*The Court:* Okay. You've heard about this case?

*Juror Godwin:* Yes, I have.

*The Court:* And how is that you have heard about it?

*Juror Godwin:* TV.

*The Court:* TV. Have you read anything in the paper?

*Juror Godwin:* No, I don't have time to read the paper.

*The Court:* Okay. As a result of what you seen on TV, have you developed any opinions that would make you an unfair juror?

*Juror Godwin:* No, I haven't.

\*   \*   \*

*The Court:* Have you heard about this case?

*Juror Moynihan:* Yes.

*The Court:* How have you heard about it?

*Juror Moynihan:* Through the media, paper and TV.

*The Court:* All right. You recall reading the article that I held up?

*Juror Moynihan:* I may have, but I don't remember reading it.

*The Court:* As a result of what you heard and read, have you formulated any opinions?

*Juror Moynihan:* No.

\*   \*   \*

clusory and merely suggested the answer. They provided no insight into the bias or prejudices the veniremen may have developed as a result of their media exposure and allowed the trial court to simply accept at face value the word of those veniremen who indicated that they had not formed opinions or, if they had formed opinions, that they could set aside their opinions.

While the trial court was not required to present the questionnaire to the jury or to consider any or all of the questions posed by defense counsel regarding media exposure, it should have made, or at least allowed defense counsel to make, a more extensive inquiry into the subject of media exposure. If a trial court is going to take the unusual procedure of conducting voir dire, as opposed to allowing the attorneys for the parties to participate, we believe that it then has the responsibility to ask probing questions and, if necessary, to consider relevant questions posed by the attorneys.[8] If the trial court had done so in the present case, defense counsel would have had substantive information regarding the bias or prejudices the veniremen may have developed from their media exposure to challenge a juror for cause. Even if a

---

*The Court:* Have you heard about this case?

*Juror Lengyel:* Yes.

*The Court:* And how have you heard about it?

*Juror Lengyel:* Just the newspaper?

*The Court:* The newspaper? Have you seen anything on TV?

*Juror Lengyel:* No.

*The Court:* Radio?

*Juror Lengyel:* Uh-uh.

*The Court:* Do you recall reading the article that I held up?

*Juror Lengyel:* I remember seeing it, but don't remember reading it.

*The Court:* Have you formulated any opinions on this case?

*Juror Lengyel:* No.

[8] The attorney, in her written questions, sought in part to determine the quantity and the source of pretrial publicity exposure, what the veniremen remembered and opinions formed on the basis of pretrial publicity.

more extensive voir dire might not have exposed actual juror prejudice to merit a challenge for cause, it might have provided defendant with information to utilize in exercising peremptory challenges to exclude jurors that had been subjected to greater media exposure of the case, or had seen newspaper articles that defendant deemed particularly prejudicial, or a basis for defendant to determine that a venireman was not entirely forthcoming about having developed opinions because of the media reports.

Accordingly, we believe that voir dire was deficient and that the trial court abused its discretion in the manner in which it limited and conducted the voir dire. Further, we are unable to conclude that the jury selection process and the trial court's failure to ask probing questions was not prejudicial to defendant. See *People v Miller,* 411 Mich 321, 326; 307 NW2d 335 (1981). Without the benefit of any probing questions, we do not know what answers the veniremen would have given and what such answers would have meant to defendant in exercising a challenge for cause or a peremptory challenge.

In summary, the cumulative effect of the trial court's failure to conduct sequestered voir dire, failure to allow defendant's attorney to meaningfully participate in the jury selection process, and failure to ask probing questions regarding media exposure, prevented defendant from receiving a fair trial. In future highly publicized cases, we believe that trial courts would be well advised, first, to determine whether the attorneys, who theoretically are the most knowledgeable about the case, should be precluded from actively participating in the voir dire, and, second, to determine whether a venireman has been subjected to adverse media exposure. If adverse media exposure

has occurred, sequestered voir dire may be preferable or even necessary to prevent a vireman's answers from tainting the remainder of the panel. These decisions, of course, would be left to the discretion of the trial court. While we do not intend to adopt a hard and fast rule that attorneys must in all cases be allowed to conduct the voir dire or that voir dire should be sequestered in every highly publicized case, we believe that the method of jury selection must be more sensitive to the fact that viremen with personal knowledge from adverse media exposure may taint the rest of the jury panel. We also believe that if the trial court is going to remove the attorneys from the process and conduct voir dire on its own, then probing questions regarding media exposure should be asked, whether it be through a questionnaire submitted by counsel, the utilization of such questions, or by the trial court sua sponte. The questions asked by the trial court must be probing enough to allow meaningful decisions to be made regarding challenges for cause and peremptory challenges by the attorneys for the parties. For this reason, prudence may suggest that exclusion of the litigants' attorneys from the voir dire should be sparely done.

In this case, we are constrained to conclude that the trial court's voir dire of the prospective jurors was a perfunctory exercise rather than a probing inquiry that would be necessary in a highly publicized case to enable counsel to obtain sufficient information necessary to make an informed decision to exercise a challenge to a juror, either for cause or peremptorily. Accordingly, defendant is entitled to a new trial.

In light of our disposition of this case, the remaining issues raised by defendant will not be addressed.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

L. P. Borrello, J., concurred.

Sawyer, P.J. *(dissenting).* I respectfully dissent.

While I understand the concerns of the majority about the extent of the voir dire and would perhaps agree that a somewhat more extensive voir dire would have been appropriate, there remains the question whether these concerns rise to the level of necessitating reversal. That is, while I would perhaps agree that the voir dire could have been handled better and that the trial court should have made, or allowed defense counsel to make, a more extensive inquiry into the subject of media exposure, that does not equate with a finding of an abuse of discretion. On balance, I cannot say that the trial court's handling of the voir dire rises to the level of an abuse of discretion.

The majority seems to be in search of the perfect trial when our concern is whether defendant received a fair trial. After reviewing the voir dire and the trial transcript, I am satisfied that while defendant may not have received a perfect trial, he did receive a fair trial by an impartial jury of his peers. Therefore, I would affirm.