PEOPLE v TYBURSKI

Docket No. 95719. Argued December 2, 1993 (Calendar No. 6). Decided July 19, 1994.

Leonard Tyburski was convicted by a jury in the Detroit Recorder's Court, Richard P. Hathaway, J., of second-degree murder. The Court of Appeals, MURPHY and L. P. BORRELLO, JJ. (SAWYER, P.J., dissenting), reversed and remanded the case for a new trial, concluding that the trial court abused its discretion in limiting the scope and conduct of voir dire and that the cumulative effect of its refusal to conduct sequestered voir dire, its failure to allow meaningful participation by the defense counsel in the jury selection, and the absence of probing questions during voir dire prevented the defendant from receiving a fair trial (Docket No. 122380). The people appeal.

In an opinion by Justice MALLETT, joined by Chief Justice CAVANAGH and Justice LEVIN, and an opinion by Justice BOYLE, the Supreme Court affirmed the judgment of the Court of Appeals.

Justice MALLETT, joined by Chief Justice CAVANAGH and Justice LEVIN, additionally stated that in cases involving high publicity, a juror's self-assessment of bias should not be accepted without first eliciting information concerning the content and extent of the juror's exposure to publicity so that the court can make its own determination of the juror's impartiality. While it is within the trial court's discretion to select the method for eliciting such information, it is an abuse of discretion to abdicate this responsibility. Because the trial court abused its discretion by failing to conduct a sufficiently probing voir dire to uncover potential juror bias, the defendant was denied a fair trial.

The purpose of voir dire is to elicit sufficient information for development of a rational basis for excluding potential jurors who are not impartial. The trial court has discretion in both the scope and the conduct of voir dire; however, where the trial court, rather than the attorneys, conducts voir dire, the court abuses its discretion if it does not adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised. A trial court must conduct a thorough and conscientious voir dire

designed to elicit enough information for the court to make its own assessment of bias.

In this case, the superficial and leading questioning by the trial court was an abuse of discretion. The court was put on notice of the high likelihood of media-induced bias, yet its manner of questioning appears to have focused on qualifying jurors, rather than on discerning bias. Its manner of limiting and conducting voir dire and its failure to ask probing questions was prejudicial to the defendant.

Justice LEVIN, writing separately, stated that while a litigant does not always have the right to have counsel conduct the voir dire, in this case, the trial court abused its discretion when it refused to permit the defendant's lawyer at any time to question the jurors individually.

The trial court's method of questioning en masse failed to provide the defendant with a sufficient factual basis to challenge a prospective juror's ability to serve impartially, and prevented informed exercise of peremptory challenges and challenges for cause. In a high-profile case, where the risk of a verdict based on extrajudicial influences is substantial, lawyer participation at some point in the conduct of voir dire is ordinarily essential to an informed exercise of the right of challenge. The extent and nature of pretrial publicity determines the specificity and depth of questioning that should be permitted on voir dire. This necessarily varies, depending on the facts of each case and the nature and extent of pretrial publicity and community passion.

Justice BOYLE, concurring in the result, stated that although potential jurors need not be sequestered during voir dire, in highly publicized cases, special caution is appropriate.

In this case, the record supports the conclusion that counsel asked the court to question venire members about what they heard or remembered from pretrial publicity and that the court did not do so.

Affirmed.

Justice BRICKLEY, joined by Justices RILEY and GRIFFIN, dissenting, stated that the trial court did not abuse its discretion in denying defendant's motions for a sequestered, individualized voir dire and for submission of a questionnaire to prospective jurors. The questions chosen by the trial judge to assess jurors' media exposure were sufficiently probative when considered in the context of defense counsel's motion expressing her belief that questions requiring a prospective juror to expound on the reasons underlying any opinions held served only to taint the panel.

The primary function of voir dire is to elicit from prospective

jurors information that establishes a basis for a challenge for cause. An additional related function is to facilitate the intelligent use of peremptory challenges. Voir dire also can be used by attorneys to educate prospective jurors regarding the merits and theories of the case and to develop a rapport between the jurors and attorneys that may produce a biased instead of an objective jury, thereby serving to negate the purpose of voir dire. For this reason, the trial judge must be given considerable latitude to determine what questions will be submitted to prospective jurors.

There is no right under the federal constitution to ask prospective jurors content-based questions during voir dire that are designed to reveal the nature and extent of their pretrial media exposure in cases involving high publicity. In this case, the trial court's failure to submit defense counsel's questionnaire to the prospective jurors did not violate the defendant's Sixth Amendment right to a fair trial or his Fourteenth Amendment right of due process. The trial court questioned prospective jurors individually concerning whether information to which they were exposed had led them to form opinions that would render them incapable of being impartial. Every prospective juror confessing an opinion that the defendant was guilty or who expressed an inability to be fair was excused for cause. Despite the pervasive pretrial publicity that surrounded the trial, no member of the jury professed a belief in the defendant's guilt before hearing any of the testimony.

Generally, a trial court does not abuse its discretion when it declines to submit questions to prospective jurors that are designed to reveal substantial prejudices, or to develop a rational basis for the exercise of challenges, as long as the trial court employs similar questions that adequately cover the area of potential bias. In this case, the trial court's refusal to submit the defendant's proposed questionnaire to prospective jurors did not constitute an abuse of discretion. The questions propounded by the trial court were sufficiently probative and elicited information similar in kind to information the questionnaire would have provided.

Further, the trial court did not err in allowing juror self-assessment of bias to go unchallenged. The court in fact was cognizant of and attentive to the problems underlying juror self-assessment of bias. Finally, the trial court did not abuse its discretion in denying the defendant's request for a sequestered voir dire. When confronted with prejudicial pretrial publicity, a trial court must be sensitive to the potential taint of the venire engendered by responses during voir dire. In such a situation

sequestered voir dire should be considered. No information prejudicial to the defendant surfaced on voir dire.

196 Mich App 576; 494 NW2d 20 (1992) affirmed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Janice M. Joyce Bartee,* Assistant Prosecuting Attorney, for the people.

*F. Randall Karfonta* for the defendant.

Amici Curiae:

*Neal Bush, Kenneth M. Mogill,* and *Dean Robb* (*Susan L. Stacey,* of counsel), for Criminal Defense Association of Michigan and National Jury Project.

MALLETT, J. The issue presented in this highly publicized murder case is whether defendant is entitled to a new trial because of the manner in which the trial judge conducted voir dire. Because the trial court abused its discretion by failing to conduct a sufficiently probing voir dire in order to uncover potential juror bias, and that, therefore, defendant was denied a fair trial, we affirm the decision of the Court of Appeals and remand the case for a new trial.

I

The Court of Appeals opinion sufficiently summarizes the underlying facts surrounding the murder.

Following a jury trial, defendant was convicted as charged of second-degree murder, MCL 750.317;

MSA 28.549. He was sentenced to serve twenty to forty years in prison. . . .

This case arises from defendant's killing of his wife on September 28, 1985. This fact is not in dispute. The case has received a great deal of publicity because of the unusual manner in which defendant disposed of the body: he stored it in a chest freezer in his basement for over three years. The body was discovered by his elder daughter on January 2, 1989.

Defendant admits killing his wife, Dorothy Tyburski, but claims that it was not murder but a killing in the heat of passion, thus manslaughter, or that he killed in self-defense. Defendant admitted the killing in his own testimony. He stated that his wife told him that she wanted him to leave for a couple of weeks and that she no longer loved him. Defendant replied that he still loved her and refused to leave. He then asked the victim whether she was having an affair with the eighteen-year-old boyfriend of their elder daughter. The victim refused to answer. She grabbed a knife and fork and went downstairs to get something out of the freezer. Defendant followed her to continue the conversation.

In the basement, the victim took some plastic containers out of the freezer. Defendant again asked her if she was having an affair with their daughter's boyfriend. The victim responded with words to the effect of, "Yes, I am. I love Craig. He's a man. You're not a man. You're a wimp, a punk, a bastard. You're leaving. Get out of here." The victim threw the frozen food containers, along with the knife and fork, at defendant as she said the words.

The victim came at defendant with her hands. Defendant pushed her away. The victim retrieved the knife and lunged at him with it. Defendant stated that he was in shock at this point over learning of the affair and afraid because of the physical attack. After he stopped the victim from stabbing him, he slammed her head into a beam many times. He then flung her into the freezer. He

went upstairs, cleaned up, and returned to the basement a half-hour later. He noticed that the victim was motionless and was not breathing. At this point, he closed the freezer and never opened it again.

* * *

As for the cause of death, the medical examiner testified that the victim died of blunt-force trauma to the head. He testified that the injuries were inflicted by hitting the victim's head into a blunt object, rather than vice versa. The medical examiner described a minimum of eleven blows to the head. Finally, the medical examiner ruled out suffocation as a cause of death. Thus, the victim was dead before defendant closed the freezer. [196 Mich App 576, 577-580; 494 NW2d 20 (1992).]

The details of the voir dire process are important and merit thorough review.

Before voir dire commenced, defense counsel moved for an individual sequestered voir dire and submission of a probing questionnaire to be given to prospective jurors. The trial court denied these requests, informing counsel that the court conducts its own voir dire for all its trials. Defense counsel also asked if the attorneys would be allowed to ask follow-up questions. The court said no, but that if specific follow-up questions came to mind after hearing a potential juror's response to a question, the attorneys could write them down and the court would submit them.

When the questioning began concerning potential jurors' exposure to pretrial publicity, the court gave a brief description of the case and asked how many had heard of it from the media. All the potential jurors initially seated raised their hands.[1]

---

[1] All but two of the thirty-seven potential jurors eventually called for questioning acknowledged exposure to the media coverage. Of the twelve jurors who decided the case, all but one acknowledged such exposure.

The court then began questioning individual potential jurors. The first colloquy was as follows:

> *The Court:* All right. If you are selected as a juror, what you are going to have to do, Ms. Whitehead [sic], is basically separate what you have heard on TV or on the radio or in the newspaper and judge this case on what you hear in the courtroom. Have you developed any opinions thus far or feelings on this case one way or another as to what you've heard or read?
>
> *Juror Whiteside:* Yes.
>
> *The Court:* What are those feelings?
>
> *Juror Whiteside:* In reading the article on it, I would tend to think that he would be guilty.
>
> *The Court:* All right. Do you believe everything that you read in the newspaper?
>
> *Juror Whiteside:* No.
>
> *The Court:* Okay. Do you think that that is a way to settle disputes as to guilt or innocence by reading the newspaper?
>
> *Juror Whiteside:* No.
>
> *The Court:* Okay. If I were to tell you, Ms. Whitehead [sic], that you have to decide this case based on what you hear in the courtroom, will you be able to set aside your beliefs, set aside your opinions and listen to this case and render a fair decision?
>
> *Juror Whiteside:* No.
>
> *The Court:* No. Do you think what you've read thus far has tainted you to such a degree that you do not think that you could be fair to this defendant?
>
> *Juror Whiteside:* Yes.

With this subtle admonishment of Juror Whiteside, the court had instructed the remaining potential jurors regarding the "correct" answer. Ms. Whiteside was excused for cause.

Likewise, the fourth and eighth potential jurors questioned admitted to having formed opinions against the defendant and that they would have

difficulty setting aside these opinions. Although they were also excused for cause, in the court's questioning of the eighth juror, Ms. Zimmer, the entire pool heard admonitions similar to those given to the first juror.[2]

The first of those initially seated to remain as jurors were the tenth and thirteenth questioned. Number ten, Mr. Gray, was questioned as follows:

*The Court:* Okay. How about you, Mr. Gray, do

---

[2] *The Court:* Okay. As a result of what you have heard and read, have you formulated any opinions?

*Juror Zimmer:* Well, I'm afraid I would have to say I did.

*The Court:* Okay. And those opinions are not favorable toward Mr. Tyburski?

*Juror Zimmer:* That's right.

\* \* \*

*The Court:* You understand, Ms. Zimmer, don't you, as I've discussed earlier that this case is going to be decided in the courtroom; isn't that correct?

*Juror Zimmer:* Yes.

*The Court:* You understand that?

*Juror Zimmer:* Yes.

*The Court:* And you don't believe that cases should be decided by the media, do you?

*Juror Zimmer:* No, I don't.

*The Court:* You don't believe that case[s] should be decided by what you read in the newspaper, do you?

*Juror Zimmer:* No.

*The Court:* You don't believe that cases should be decided on what you hear or say [sic] on the TV; isn't that correct?

*Juror Zimmer:* That's right.

*The Court:* Okay. But you are telling me that you've developed such a strong opinion that you'd have a hard time being a fair juror; is that correct?

*Juror Zimmer:* Well, I would have a rough time, I think.

*The Court:* You'd have a rough time?

*Juror Zimmer:* Yes, I believe I would.

*The Court:* Even though you believe that cases shouldn't be decided on what you heard and read in the newspaper?

*Juror Zimmer:* I realize that . . .

*The Court:* You don't know if what you've read is accurate, do you? There's no way for you to know that; isn't that correct?

*Juror Zimmer:* That's true.

you recall hearing or reading anything about this case?

*Juror Gray:* On the news.

*The Court:* Okay. As a result of what you've heard or read, did you develop any beliefs or opinions?

*Juror Gray:* No.

*The Court:* Okay. Can you think of any reason why you should not sit and be a fair juror?

*Juror Gray:* No.

The questioning of juror number thirteen, Mr. Traylor, was similar to that of Mr. Gray.

*The Court:* Okay. How about you, Mr. Traylor? Do you recall hearing about this case?

*Juror Traylor:* I saw it on the news.

*The Court:* You saw it on the television?

*Juror Traylor:* And I started reading an article in the paper, but I can't remember what happened. But I never finished it.

*The Court:* You never finished the article?

*Juror Traylor:* No.

*The Court:* Have you developed any opinions or beliefs?

*Juror Traylor:* No.

*The Court:* Okay. Can you think of any reason why you should not sit and be a fair juror?

*Juror Traylor:* No.

The last potential juror questioned in the morning session admitted to having formed opinions and that she did not believe she could be fair. The court replied:

*The Court:* You heard me tell some of the other jurors that we are not going to decide this case based on what is in the papers?

*Juror Williams:* Yes.

*The Court:* And you don't think that that's the way a society should be run, do you?

*Juror Williams:* No.

*The Court:* Based upon what you read in the newspapers, do you think everything is truthful?

*Juror Williams:* No.

*The Court:* Okay. But you are telling me that based on what you've read, you don't think you can separate it and be fair?

*Juror Williams:* Yes. I couldn't.

The court then recessed for a lunch break. During this recess, defense counsel submitted a written objection to the method of questioning used by the court. This objection was overruled.

The first potential juror questioned in the afternoon session, Mr. Rae, who was eventually seated as a juror, was asked to relate his potential bias resulting from pretrial publicity.

*The Court:* And how is it that you heard about this case?

*Juror Rae:* I think I recall a television newscast.

*The Court:* All right. Did you hear my statement that this case will be decided in the courtroom rather than by the media?

*Juror Rae:* Yes, your Honor.

*The Court:* Have you developed any opinions that would make you an unfair juror?

*Juror Rae:* No.

Juror Palmer, the third person questioned in the afternoon session was similarly asked to self-assess her potential bias.

*The Court:* How is it that you heard about this case?

*Juror Palmer:* On the news, read the paper.

*The Court:* Okay. Have you developed any opinions that would make you an unfair juror?

*Juror Palmer:* No.

*The Court:* If you are to sit and listen to this

case, will you judge this case on what you hear in the courtroom?

*Juror Palmer:* Yes.

*The Court:* Can you think of any reason why you should not sit?

*Juror Palmer:* No.

Juror Palmer was eventually seated as a juror.

Likewise, the next person questioned was seated as a juror after passing the following scrutiny about potential bias from the media blitz:

*The Court:* Mr. Wilson, have you heard about this case?

*Juror Wilson:* Yes, I have.

*The Court:* And how is it that you heard about this case?

*Juror Wilson:* Television, news and I also was down in Columbus last—two weeks ago and I heard it on the TV down there.

*The Court:* As a result of what you've seen and heard, have you developed any opinions that would make you an unfair juror?

*Juror Wilson:* No, I have not.

After additional questioning of two more potential jurors, defense counsel asked to approach the bench. Following a discussion off the record, the court asked the group, by show of hands, who had read a particular Free Press magazine article.[3] The record does not indicate if any jurors responded affirmatively.

The court then asked the attorneys if they had any written questions to submit at that time. Defense counsel answered "No, your Honor, just the ones that I have submitted." The court an-

---

[3] The article entitled "I found Mom!" appeared in the Detroit Free Press, Sunday Magazine, April 23, 1989. See n 10 for excerpts from this article. Defense counsel viewed it as particularly prejudicial.

swered that those that were not asked were not deemed relevant.[4]

At this point, the attorneys began exercising peremptory challenges. As the remaining potential jurors were questioned, three were excused for reasons relating to opinions formed after exposure to pretrial publicity. Nine of the remaining jurors questioned sat on the jury. The questioning of these nine on the issue of publicity-induced bias was perfunctory. An example is as follows:

*The Court:* Have you heard about this case?

*Juror Moynihan:* Yes.

*The Court:* How have you heard about it?

*Juror Moynihan:* Through the media, paper and TV.

*The Court:* All right. You recall reading the article that I held up?

*Juror Moynihan:* I may have, but I don't remember reading it.

*The Court:* As a result of what you heard and read, have you formulated any opinions?

*Juror Moynihan:* No.

After the jury was selected, defense counsel moved for a mistrial because of the court's voir

[4] The following questions from defendant's proposed questionnaire are illustrative of the difference between the questions posed by the trial court and those requested by the defense:

7. . . . .
—What do you remember from reading those articles?
8. Did you see television coverage of this case?_____;
—What stands out in your mind about what you saw on TV?
9. Did you talk about this case with family, friends or co-workers?
—What stands out in your mind about what was discussed?
10. After hearing about this case, what was your reaction?
11. Did you form an opinion about anything connected to this case? If so, what was your opinion?

dire procedure. Although counsel did not exercise all of her peremptory challenges, she explained:

> I did not exercise all of our preemptory [sic] challenges. I was careful to say in closing yesterday not that I was satisfied with the juror panel but that I was not going to exercise on behalf of Mr. Tyburski any further pre-emptories [sic]. I don't believe that using pre-emptories [sic] would have cured the Court's procedure here. And I am not satisfied that this is an impartial jury. . . . So I do move for a mistrial at this time.

This motion was denied.

II

A defendant who chooses a jury trial has an absolute right to a fair and impartial jury. *Duncan v Louisiana,* 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968); *People v Miller,* 411 Mich 321, 326; 307 NW2d 335 (1981). The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury. *People v Brown,* 46 Mich App 592, 594; 208 NW2d 590 (1973); *People v Harvey,* 167 Mich App 734; 423 NW2d 335 (1988). In voir dire, meaning "to speak the truth," potential jurors are questioned in an effort to uncover any bias they may have that could prevent them from fairly deciding the case. It is the only mechanism, and the only safeguard a defendant has, for ensuring the right to an impartial jury. The propriety of the voir dire in this case turns on whether potential jurors who have been exposed to pervasive and sensationalized media coverage can "speak the truth" about their own bias, or whether a trial court must elicit more than mere self-assessment in order to safeguard a defendant's right to an impartial jury.

A

The trial court has discretion in both the scope and the conduct of voir dire.[5] Defendant does not have a right to have counsel conduct the voir dire, nor does he have a right to individual, sequestered voir dire. Neither does he have a right in every case to have the court ask questions submitted by counsel. The United States Supreme Court has also determined that there is no federal constitutional right to content-based publicity questions in every high publicity case. *Mu'Min v Virginia,* 500 US 415; 111 S Ct 1899; 114 L Ed 2d 493 (1991).

However, this Court has determined that where the trial court, rather than the attorneys, conducts voir dire, the court abuses its discretion if it does not adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised. *Fedorinchik v Stewart,* 289 Mich 436, 438-439; 286 NW 673 (1939).

This Court has long recognized the importance of a voir dire that allows the court and the parties to discover hidden bias that would render a potential juror incompetent.

---

[5] MCR 6.412(C) provides:

(1) Scope and Purpose. The scope of voir dire examination of prospective jurors is within the discretion of the court. It should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges. The court should confine the examination to these purposes and prevent abuse of the examination process.

(2) Conduct of the Examination. The court may conduct the examination of prospective jurors or permit the lawyers to do so. If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask. On its own initiative or on the motion of a party, the court may provide for a prospective juror or jurors to be questioned out of the presence of the other jurors.

It is the evident intent of the law to secure a jury that shall come to the consideration of the case unaffected by any previous judgment, opinion or bias with respect either to the parties or subject-matter in controversy, and it is important to the rights of parties that they may be permitted inquiries which may be the means of discovering facts which will justify the exclusion of a juror. The success of a challenge depends upon eliciting such information from the juror himself, as well as from other sources, as to his state or condition of mind, as will enable a judgment to be formed *by the court* as to his competency. [*Monaghan v Agricultural Fire Ins Co,* 53 Mich 238, 246; 18 NW 797 (1884). Emphasis added.]

It is imperative, in securing the rights of the parties to an impartial jury, for the court to allow the elicitation of enough information so that the court itself can make an independent determination of a juror's ability to be impartial.

We will not address defendant's federal and state constitutional claims because there is no need to do so. Both Michigan and federal law support the conclusion that the superficial and leading questioning that took place here was an abuse of discretion.

In *Mu'Min, supra,* the United States Supreme Court, in a five to four decision, found that although inquiries into the content of news reports that a potential juror had read might have been beneficial in exercising peremptory challenges, peremptory challenges are not constitutionally mandated and therefore no constitutional violation had occurred. The Court noted that in reviewing a state court voir dire its authority was limited to enforcing the commands of the United States Constitution.

We enjoy more latitude in setting standards for

voir dire in federal courts under our supervisory
power than we have in interpreting the provisions
of the Fourteenth Amendment with respect to voir
dire in state courts. [500 US 424.]

The Court did not limit the authority of federal
courts of appeals to continue requiring a voir dire
that includes content questions in federal cases.
See *Mu'Min,* 500 US 447, n 6 (Marshall, J., dis-
senting).

After *Mu'Min,* some federal courts of appeals
have required content questions in high publicity
cases, explaining that the court needs to inquire
into the source and content of the exposure and
the potential juror's attitudes towards what they
have heard or read in order to discover the truth
regarding potential bias.

The court in *United States v Davis,* 583 F2d 190
(CA 5, 1978), explained the need for such question-
ing.

"[T]his Circuit has determined that it is for the
court, not the jurors themselves, to determine
whether their impartiality has been destroyed by
any prejudicial publicity they have been exposed
to. Therefore, when there has been publicity that
would possibly prejudice the defendant's case if it
reached the jurors, the court should first ask the
jurors what information they have received. Then
it should ask about the prejudicial effect and it
should make an independent determination
whether the juror's impartiality was destroyed."
[*Davis* at 197, quoting *United States v Hyde,* 448
F2d 815, 848, n 38 (CA 5, 1971).]

Employing similar reasoning, the court in *Sil-
verthorne v United States,* 400 F2d 627, 638 (CA 9,
1968), found that the trial court's "voir dire exami-
nation did not adequately dispel the probability of
prejudice accruing from the pre-trial publicity and

the jury panel members' knowledge of the case."
That court predicated its conclusion on two
grounds:

> (1) the questions propounded by the court to the
> prospective jurors were calculated to evoke respon-
> ses which were subjective in nature—the jurors
> were called upon to assess their own impartiality
> for the court's benefit, and (2) the entire voir dire
> examination was too general to adequately probe
> the prejudice issue. [*Id.*]

Other state supreme courts, citing their supervi-
sory powers over lower courts, have also stated
that despite the sufficiency of voir dire for consti-
tutional purposes under the standards of *Mu'Min,*
trial courts should conduct voir dire in a manner
that attempts, as much as possible, to eliminate
bias and prejudice. *State v James,* 819 P2d 781,
787-789 (Utah, 1991). See also *State v Everett,* 472
NW2d 864, 866, n 1 (Minn, 1991).[6]

---

[6] The pre-*Mu'Min* state supreme court decision in *State v Pokini,* 55
Hawaii 640; 526 P2d 94 (1974), is also instructive. A review of that
case indicates that the pretrial publicity was not as pervasive as it
was here. Yet, the Hawaii Supreme Court concluded that failure to
conduct a probing voir dire denied the defendant his constitutional
right to an impartial jury.

> Given the quantity, quality, and timing of this pre-trial
> publicity, it was incumbent on the trial judge to conduct a
> thorough-going examination of veniremen who indicated they
> had been exposed to it. Yet without exception the trial judge
> relied on perfunctory and generalized questions which elicited
> responses from these jurors solely on their subjective ability to
> ignore pre-trial publicity and be fair and impartial. He ex-
> pressly refused to allow inquiry into the extent and nature of
> the specific matters of publicity to which jurors had been
> exposed. Where pre-trial publicity is as extensive and as likely
> prejudicial as it was here, the constitutional right to an impar-
> tial jury requires examination into objective as well as subjec-
> tive indicia of non-prejudice. [*Pokini* at 643-644.]

> There is an essential difference between subjective and objec-
> tive evidence of juror impartiality. The federal and state consti-

This Court, in keeping with our past decisions[7] respecting parties' rights to an impartial jury, likewise instructs the lower courts in this state to guard against potential bias resulting from media exposure. Pursuant to our supervisory powers under Const 1963, art 6, § 4,[8] we instruct lower courts to conduct a thorough and conscientious voir dire designed to elicit enough information for the court to make its own assessment of bias.

B

This area of the law does not lend itself to hard and fast rules regarding what is acceptable and what is unacceptable practice. Courts indeed should be allowed wide discretion in the *manner* they employ to achieve the goal of an impartial jury. However, a court does not have discretion to simply fail to elicit enough information during voir dire to make an intelligent assessment of bias. See *Monaghan* and *Fedorinchik, supra.*

Where pretrial publicity creates the danger of prejudice, a court has several options. It can allow submission of a questionnaire to potential jurors, prepared by the parties and approved by the court. Questionnaires have the advantage of allowing an in-depth exploration of the source, extent, and content of media exposure for each potential juror

---

tutions require the trial judge to attempt to adduce both where pre-trial publicity is as extensive as that preceding the trial of these appellants. [Citation omitted.] The trial judge's express refusal to do so was reversible error because it foreclosed from his consideration crucial evidence of possible juror bias, thereby rendering fatally uninformed the exercise of his discretion not to excuse jurors for cause. [*Id.* at 644.]

[7] See *Monaghan* and *Fedorinchik, supra,* and *Poet v Traverse City Osteopathic Hosp,* 433 Mich 228; 445 NW2d 115 (1989).

[8] See *Tomlinson v Tomlinson,* 338 Mich 274, 276; 61 NW2d 102 (1953), and *In re Huff,* 352 Mich 402, 417-418; 91 NW2d 613 (1958), for a general discussion of this Court's supervisory powers.

at a minimum of the court's time. However, questionnaires have the disadvantage of not allowing observation of demeanor in order to assess credibility. Used in the proper context, however, they serve as a useful starting point by allowing identification of those potential jurors who may be most tainted because of exposure to particularly prejudicial news items or by extensive exposure.

Another option is to allow attorneys to participate in the voir dire. Because the attorneys are more familiar with the complexities and nuances of the case, they are in a better position than the trial court to ask in-depth questions designed to uncover hidden bias. However, in attorney-conducted voir dire, there is a risk that the skillful attorney can inject partiality by establishing rapport and introducing his theory of the case to the jury.

Yet another method effective in securing an impartial jury is to question individuals or small groups away from the remaining veniremen. This allows probing questions and detailed answers without the risk of tainting the other jurors.[9]

c

Despite being alerted by defense counsel of extensive media coverage, much of this being negative toward the defendant,[10] and becoming aware

---

[9] It also allows the court to assess the demeanor of potential jurors as well as their attitudes toward the case. This provides a basis for the court to make an individual judgment regarding a potential juror's ability to be impartial.

[10] The dissent's characterization of the nature of the publicity surrounding this case as "mainly factual" is incorrect. After reviewing the record, it is clear that many of the news items were in fact negative and prejudicial toward the defendant. The following excerpts are instructive:

From "I found Mom!" Detroit Free Press, Sunday Magazine, April 13, 1989:

Leonard Tyburski did more than kill his wife. According to his confession the day of his arrest, he slammed her head against a concrete pole in the basement after she came after him with a steak knife, while taunting him with news that she had had sex with Kelly's 18-year-old boyfriend. Once she was dead, he twisted her bloodied 5-foot-4, 135-pound body and stuffed it into the family freezer, atop frozen hamburger and kielbasa.

*　*　*

But Dorothy Tyburski suffered the ultimate indignity. The man who had made her miserable while she lived also succeeded in trivializing her desperate end. Her death became a standard of grisly comparison for other macabre tales, and the butt of morbid jokes.

From the Detroit Free Press, January 5, 1989:

For instance, how could Tyburski pass a lie detector test administered by the State Police in 1987 and how could he continue to live in his house knowing his freezer contained a dead body?

*　*　*

Joseph Buckley, president of John Reid & Associates, a Chicago-based polygraph firm, said that assuming the State Police polygraph technicians were well-trained and using proven testing techniques, an erroneous reading could have come from using a subject "with severe psychological problems who . . . operates on different norm than most of us."

"If you're testing somebody that believes he is Napoleon, he will pass the test because he believes it is true," Buckley said.

*　*　*

A person might learn to live with something as morbid as his wife's corpse if he was severely sociopathic—"a person with relatively little or no conscience," said Dr. Philip Veenhuis, spokesman for the Michigan Psychiatric Society.

From the Detroit Free Press, January 6, 1989:

The friend said he and Kelly had searched for her mother in the Monroe and Toledo areas based on information from her father.

"He made up some very good lies," the friend said. "He would make up stuff like she's been charging on charge accounts and he was mad at her."

*　*　*

He described Dorothy Tyburski as "a real nice lady," but said she and her husband didn't get along. "The more she was out of the house, the better she felt."

that virtually all the venire had been exposed to this coverage, the court elected to forgo all of the above procedures.[11] Because the court was put on notice of the high likelihood of media-induced bias, the court had a duty to exercise caution in the manner it conducted voir dire.[12] See *Davis* and *Silverthorne, supra.*

Individual sequestered voir dire was not necessarily required, as long as the method of questioning was adequate to expose bias and to avoid taint. The problem occurring in this case was that once the motions for sequestered voir dire and submission of the questionnaire were denied, an irreconcilable dilemma arose. If the court had asked

> The friend described Leonard Tyburski as "just a loud person, and when he'd get mad, he was an Adolf Hitler."
>
> *　*　*
>
> Her friend said Kelly didn't tell police about her suspicions because "she was afraid if she'd called the cops and her dad had come home, he would have done something to her."

[11] Although, as the dissent points out, the trial court told counsel that follow-up questions could be submitted, and indeed it appears that some were, follow-up questions that were more probing into the source and nature of the exposure of each juror were essentially precluded. This was made evident when the trial court indicated to defense counsel that those follow-up questions that had been submitted and were not asked were deemed irrelevant.

[12] As a practical matter, few murder cases engender the extent of media coverage involved here. It would be far better to take the extra time in voir dire with the few cases that pose a serious risk of prejudice rather than face future appeals of voir dire issues.

The arguments of the prosecutor that a certain amount of publicity is required before the "presumption of impartiality" can be overcome misses the point. The prosecutor analogizes to venue law. However, as Justice Marshall noted, cases such as *Irvin v Dowd,* 366 US 717; 81 S Ct 1639; 6 L Ed 2d 751 (1961), stand "for the proposition that when a community has been subject to unrelenting prejudicial pretrial publicity the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue. . . . In this case, however, [the defendant] does not argue that the pretrial publicity was extensive enough to create a presumption of community prejudice. Rather, he argues that the publicity was prejudicial enough to create a presumption of prejudice on the part of any individual juror who actually read it." *Mu'Min,* 500 US 442, n 3 (Marshall J., dissenting).

sufficiently probing questions into the jurors' media exposure and their opinions and attitudes toward it, then the entire panel may have been tainted by the answer.

Early on, defense counsel recognized this dilemma. Counsel attempted to avoid taint by asking the court to delve into pretrial publicity, but to frame questions so that jurors could indicate whether they held an opinion without expressing what the opinion was. The court refused, determining that it wanted to know what jurors' opinion would be if they indicated they had one.

After the morning voir dire, defense counsel moved for a mistrial on the basis of the taint of the venire. With a sharpened awareness of the potential for taint, the court began to word questions so that jurors could answer in a neutral manner whether they had framed an opinion. Unfortunately, in both the morning and afternoon sessions, the court was unsuccessful in trying to delve into the extent of media exposure and the jurors' reaction to it.

Instead, the court's manner of questioning appears to have been focused on qualifying jurors, rather than on discerning bias.

Questions were framed to lead the jurors to the conclusion that they could be impartial. For example, five of the twelve jurors who decided the case were asked, "Have you developed any opinions that would make you an unfair juror?"[13] The question is ambiguous and suggests the answer that

---

[13] We recognize that this compound question was asked by the court precisely because defense counsel wanted the court to frame questions so that jurors could answer without revealing that their opinions were negative toward defendant. However, the court could have separated the two questions asking: (1) Have you developed any opinion in this case, and (2) if so, could you set this opinion aside? We note, however, that curing this defect would not have solved the problem of juror self-assessment.

the court was looking for. Those jurors who volunteered that they could not be fair because of opinions formed after exposure to negative publicity were lectured to by the court. These "lectures," heard by the entire venire, sent a strong message that the court did not approve of those who volunteered that they were biased. It is not surprising, then, that as the questioning went on fewer and fewer jurors volunteered this information.[14] Yet, the court did nothing more to assess bias than to ask the jurors themselves whether they could be fair.

Courts have long recognized that juror self-assessment of bias is inherently untrustworthy. While sitting as trial judge in *United States v Burr,* 25 Fed Cas 49, 50 (D Va, 1807), Chief Justice Marshall observed that a juror's assertions of neutrality cannot be trusted:

> Why do personal prejudices constitute a just cause of challenge? Solely because the individual who is under their influence is presumed to have a bias on his mind which will prevent an impartial decision of the case, according to the testimony. He may declare that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; but the law will not trust him. . . . He will listen with more favor to that testimony which confirms, than to that which would change his opinion . . . .

Justice O'Connor, concurring in *Smith v Phillips,* 455 US 209, 221-222; 102 S Ct 940; 71 L Ed 2d 78 (1982), expressed similar concerns stating: "Determining whether a juror is biased . . . is diffi-

---

[14] Of the initial fourteen veniremen seated for questioning, four volunteered that they had formed an opinion from their exposure to pretrial publicity that would render them unable to be fair jurors. After the lunch recess, only two of the twenty-three veniremen questioned admitted such opinions.

cult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."[15]

As previously noted, a court should allow elicitation of enough information from potential jurors to

---

[15] Examples shared with this Court by the amici curiae, Criminal Defense Association of Michigan and National Jury Project, are illuminating:

The highly publicized 1975 Massachusetts murder and bank robbery trial of Susan Saxe demonstrates that adequate voir dire can reveal the specific information, attitudes and opinions that may be hidden behind general assurances of impartiality. More than one-fourth of the 146 jurors excused for having already formed an opinion in that case had denied at least once that they had any opinion. Most striking, one prospective juror denied repeatedly that she had any opinion. She had read newspaper accounts about the case and "knew all about this naturally," but she repeatedly asserted that she could be fair, specifically denying any personal interest in the case or awareness of any bias or prejudice or inability to be impartial and repeatedly denying any opinion as to the defendant's guilt or innocence. When finally asked what she thought the defendant had done, however, the juror admitted, "Well, we all know what she has done . . . we all know the girl went in and held up the bank and the policeman was shot there." *Commonwealth v Saxe*, Suffolk Cty Super Ct #51775-77 (1976), voir dire of juror #54, transcript reprinted in *Jurywork: Systematic Techniques* (2d ed 1983) at 10-46.1-10.49. Quoted in *Mu'Min, supra* at 443, n 4 (Marshall, J., dissenting).

Another example from the amici curiae is contained in a letter from Judge Prentice H. Marshall, United States District Judge for the Northern District of Illinois to Judge Jim R. Carrigan, United States District Judge for the District of Colorado. Judge Marshall was relating his experiences when he began allowing counsel to participate in voir dire.

"Immediately Judge Norman's assertion was confirmed. A juror here and there who had assured me he or she could be fair and held no biases or prejudices admitted to a lawyer a profound bias, e.g., against police officers, black persons, etc.

"Then this fall the classic example occurred. I was presiding at a criminal case in which a labor union was a defendant. My inquiry addressed anti-union bias; virtually every prospective juror responded they had none and could be fair.

"The lawyer for the union . . . on supplemental examination elicited admissions of prejudice from *eleven* prospective jurors who were excluded for cause."

enable judgments to be formed *by the court* regarding their ability to be impartial *Monaghan, supra.*[16]

### D

Like the Court of Appeals, we cannot conclude that the trial court's manner of limiting and conducting the voir dire and its failure to ask probing questions was not prejudicial to defendant. See *People v Miller, supra* at 326. "Without the benefit of any probing questions, we do not know what answers the veniremen would have given and what such answers would have meant to defendant in exercising a challenge for cause or a peremptory challenge." *Tyburski, supra* at 590.

[16] While it is true, as the dissent points out, that potential jurors were asked to identify the general source of their information, and were asked to raise their hands if they had read a particularly prejudicial Detroit Free Press article, these questions added nothing to what basically was juror self-assessment. The questioning lacked the necessary depth of insight required for the court to make any independent determination of bias. The dissent's "general rule" that "a trial court does not abuse its discretion when it declines to submit questions to prospective jurors that are designed to reveal substantial prejudices, or to develop a rational basis for the exercise of challenges, as long as the trial court employs similar questions that adequately cover the area of potential bias," is not dispositive. *Post* at 673-674. Questions that do not go beyond juror self-assessment do not *adequately cover* the area of potential bias.

Although the dissent recognizes the potential problem of juror self-assessment, it is content that the judge did in fact carefully guard against it because he exercised caution with respect to one juror who had admitted having formed an opinion, but stated she could set that aside. The dissent notes that after further questioning by the trial judge, this juror, who had been employed by a Christian high school for several years, was excused because she revealed that she was morally opposed to killing and was not positive she could give defendant a fair hearing.

The court's apparent caution with this one juror does not negate its abandonment of caution in respect to other jurors. Those who did not voluntarily admit that they had formed opinions were merely asked if they could be impartial despite their admitted exposure to publicity. While the jurors who decided the case did not admit having formed opinions, they were asked nothing more than self-assessment of their ability to be impartial.

Therefore, we affirm the Court of Appeals decision. A juror's self-assessment of bias should not be accepted without first eliciting information concerning the content and extent of the juror's exposure to publicity so that the court can make its own determination of the juror's impartiality. While it is within the trial court's discretion to select the method for eliciting such information, it is an abuse of discretion to abdicate this responsibility.

CAVANAGH, C.J., and LEVIN, J., concurred with MALLETT, J.

LEVIN, J. (*separate opinion*). I agree with the signers of the lead opinion that the trial court abused its discretion by failing to ask questions that were sufficiently probing. I write separately to state that, while a litigant does not always have the right to have counsel conduct the voir dire, in the instant case the trial court abused its discretion when it refused to permit Tyburski's lawyer at any time to question the jurors individually.

The trial court's method of questioning en masse failed to provide Tyburski's lawyer with a sufficient factual basis to challenge a prospective juror's ability to serve impartially, and prevented informed exercise of peremptory challenges and challenges for cause.

In a high-profile case, where the risk of a verdict based on extrajudicial influences is substantial, lawyer participation at some point in the conduct of voir dire is ordinarily essential to an informed exercise of the rights of challenge.

The extent and nature of pretrial publicity determines the specificity and depth of questioning that should be permitted on voir dire. This necessarily varies, depending on the facts of each case

and the nature and extent of pretrial publicity and community passion.

I

Of the thirty-six questions submitted by Tyburski's lawyer, the lead and dissenting opinions advert to the fifteen questions concerning the amount of pretrial publicity and the jurors' exposure thereto.

Recognizing that questions merely quantifying exposure to publicity would not reveal underlying attitudes and biases and would render the voir dire incomplete,[1] Tyburski's lawyer proposed questions seeking to expose latent attitudes or biases that might, in light of the nature of the pretrial publicity, interfere with a juror's assessment of guilt based on the evidence. The questions submitted, but not posed, to prospective jurors were the following:

> This case will involve a number of very serious and sensitive issues (marital discord, adultery, death) that may tend to arouse strong feelings in some people. The following questions are intended to explore whether you have a particularly powerful emotional reaction to any of these issues that would affect your ability to concentrate, or your ability to decide this case fairly to both sides.
>
> There will be testimony in this case that the deceased, a forty-two year old woman, died from a

---

[1] Tyburski states the issue as follows:

> Where the media coverage in the freezer case was international in scope, saturated the local media, and was inflammatory against the defendant, did the voir dire process which was geared to qualify jurors without regard to media exposure, opinion or bias, violate defendant's state and federal constitutional rights as well as the Michigan common law rights to an impartial jury and effective assistance of counsel?

severe beating. When discovered her body was completely frozen. While none of us wants to be exposed to such disturbing things, some people have a far more extreme reaction and simply cannot tolerate this type of evidence.

16. Is that the way you feel?

17. Do you know anyone who died as a result of a violent incident?

18. Have you ever had the unfortunate experience of seeing a person who was seriously injured or killed?

19. Have you had any experience with the death of a loved one or friend that would make it hard for you to sit as a juror in a case like this?

20. Are your parents living or dead?

21. If one or both of your parents are now deceased, how old were you when the first of your parents died?

22. What was the cause of death?

Obviously, in our culture, and in just about every culture, there are ceremonies and rituals that we perform when someone dies.

23. Why do you think these ceremonies and rituals are important to some people?

24. Do you believe that a person who does not receive a regular or immediate burial suffers some adverse consequence?

25. Do you have any particular religious or philosophical beliefs which govern your feelings about the way bodies should be treated after death?

26. Have you known married people (or lovers) who have had frequent verbal arguments?

27. Have you known people who have had physical fights with their spouse?

28. Do you think its true that people often say and do the meanest things to the ones they love the most?

29. Have you ever witnessed a situation where a verbal argument, particularly between spouses, has escalated quickly and unexpectedly into physical violence?

30. Some people have a very strong reaction to people who are not faithful to their spouses; other people have very little reaction and don't believe that infidelity is morally wrong, depending on the circumstances. How do you feel?

31. Have you known anyone whose spouse was unfaithful to them?

32. What was their reaction to discovering that their spouse had not been faithful?

33. Was the "other" person involved in the affair a minor or a very young person? If so, do you think that made it worse? Why?

34. Have you ever heard of a situation where someone has overreacted or reacted violently to being told of or discovering adultery by their spouse?

35. Why do you think a person might react that way to hearing news of adultery?

36. Do you think that most people do have a breaking point—a point where they could be provoked into violent behavior?

The questionnaire prepared by Tyburski's lawyer sought relevant information in a measured and emotionally neutral manner. The questions were not leading. Nor did they suggest a particular answer. They did not seek to proselytize prospective jurors or to extract commitments from them. Nevertheless, the trial court declined to permit use of the questionnaire, or to pose the questions or their equivalent.

The trial court, rather, asked some, not all, the prospective jurors whether they had "religious or moral beliefs that would make you an unfair juror." In lieu of individualized, probing questions, the court asked the following compound questions, seeking a collective, *nonverbal* response:

As I told you earlier, ladies and gentlemen, if you are selected to sit on this case, you are here

for one reason and that is that you are going to decide this case.

If you hear testimony—and I really don't know what the testimony is going to be in this case—I have not seen the witnesses. I have not heard the witnesses. I will be hearing and seeing them for the first time as you will when they come before you.

But if you hear testimony—and I'm speculating as to what the testimony may or may not be as to any testimony concerning adultery or any testimony concerning violent beating or matrimonial arguments—and, of course, this is a case that involved death—but if any of those areas are brought up, if there's any testimony on those areas, is that going to shock anyone's conscience to such a degree? Or is there a background that you might have in any of those areas as to violence in the marriage or adultery or arguments that you believe might create an unfair mindset for you? Does anyone have a problem with any of those areas that are brought up in this case? If so, I'd like to see your hand raised if you think you might have a problem.

\* \* \*

And, again, I really don't know what the facts are going to show in this case. But how many people have had the unfortunate experience of seeing a parent die, pass away, maybe have gone to a hospital bed and witnessed that, something along those lines where you have actually experienced—witnessed the parent's death?

Let me see a showing of hands.

Okay. As I told you, you'll decide this case. And in this case, you will be given instructions at the conclusion of this trial, that you are to decide this case based on the facts.

Sympathy, prejudice, bias, must not influence your decision. Is there any one on this particular panel, specifically those of you who have raised your hand as a result of seeing a parent pass away that in this particular trial—since there will prob-

ably be some family, some children that will testify as to their deceased mother—would that invoke some type of sympathy in you that you think you might be prejudiced in some manner—if you can think in any way—maybe you can enlighten the Court. Maybe you might be biased in favor of Mr. Tyburski or maybe you may be prejudice [sic] against Mr. Tyburski as a result of the death of a family member and children having to go through that experience.

Anyone have a problem with that? Do you think that that might cause you to be an unfair juror? If so, I'd like to see your hand raised. Okay.

And, again, specifically dealing with one particular item that I already discussed, if there is testimony in dealing with the terminology adultery, is that going to create any feelings in someone that they believe that might make them an unfair juror in any way respect if they hear that type of terminology in this type of trial?

I think you might also hear some testimony that the deceased was in a freezer in a basement for three years.

And, therefore, immediately upon death did not receive an immediate burial when she passed away.

Is that going to create any problems maybe as a result of your background or any religious beliefs that you might have since there was not an immediate burial upon death or proper services right after the death occurred; is that going to create any problem for you as jurors?

If so, I'd like to see your hand raised. All right.

Specifically, you might hear some testimony that the deceased had an affair with a younger man. As a result of the age difference or just as a result of there being an affair—I don't know if the testimony is going to show that, but if the testimony does show something along those lines, is that going to create a problem in anyone's mind where that may be a result of beliefs, religious or otherwise, might make you think unfairly towards the deceased or unfairly towards the defendant?

Any problems if that testimony arises? If so, I'd like to see your hand raised.

You know, I imagine in some countries and even in some religions when a husband finds that his wife has committed adultery—in some religions— maybe the beliefs in that religion that death or murder may, in fact, may even be appropriate.

Does anyone harbor those beliefs? Or is anyone from a country that might have those beliefs? If so, I'd like to see your hand raised.

Is there anyone on this particular panel right now that as a result of areas that I have already covered or possibly did not cover thus far, that you would like to enlighten the Court on that you think the Court should be apprised of, maybe something in your background or it may be something that I touched on or did not touch on that you think the Court should be aware of that you think that might make you an unfair juror either towards the Prosecution or towards the defense.

If so, I'd like to see your hand raised.


II


The foregoing method of questioning was wholly inadequate to develop a factual basis for exercising peremptory challenges or challenges for cause. The trial court asked the panel a series of questions before seeking a response. Questions suggesting a "correct" answer, or providing a limited range of possible answers, fail to provide the information necessary for exercise of the rights of challenge.

Tyburski's lawyer could not have been reasonably expected to evaluate the genuineness of the responses to questions calling for raising of hands —questions calling for no verbal expression whatsoever. Tyburski's lawyer was left with only the jurors' self-assessment of their impartiality, an

unreliable measure of ability to set aside preconceptions.[2]

General questions, "Does anyone harbor those beliefs?" "Any problem if that testimony arises?" and "Anyone have a problem with that?" did not provide Tyburski's lawyer with information sufficient to develop a reliable factual basis to select a jury reasonably free of preconception.

State and federal courts recognize the inherent unreliability of juror self-assessment of impartiality. Undue reliance on a prospective juror's self-assessment of his capacity to set aside preconceptions, without further exploration, constitutes grounds for reversal.

Where the nature of the publicity raises a significant possibility of prejudice, cursory questioning by the court will not suffice. The court must take affirmative steps to assure that the voir dire provides reasonable assurance that preconceptions will be exposed. *United States v Hawkins,* 658 F2d 279 (CA 5, 1981).[3] In that case, the trial court had asked the panel as a whole to raise their hands if

---

[2] The United States Supreme Court noted the inherent unreliability of juror self-assessment of impartiality. "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. . . . [S]uch a statement of impartiality can be given little weight." *Irvin v Dowd,* 366 US 717, 728; 81 S Ct 1639; 6 L Ed 2d 751 (1961).

[3] Federal Rule of Criminal Procedure 24(a) provides:

The court may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

MCR 6.412(C)(2) provides:

they felt they could be impartial. The failure to undertake any other significant inquiry concerning specific biases was held to require reversal.

Conclusory questioning of the venire as a group concerning pretrial publicity in a well-publicized ammunition smuggling/jailbreak prosecution was similarly found to be inadequate and to require reversal. *United States v Davis,* 583 F2d 190, 197 (CA 5, 1978). The trial court had asked any member of the panel to raise his hand if he felt the publicity impaired his ability to render an impartial decision. No prospective juror indicated an inability to serve as an impartial juror. The trial court was found to have abused its discretion in failing to inquire in particular what each juror had heard or read and how it affected his attitude toward the trial, and in failing to independently determine whether each juror's impartiality had been compromised.

The failure to inquire during voir dire concerning the effects of pretrial publicity was found to require a new trial in the case of the Chicago Seven (David Dellinger, Tom Hayden, Abbie Hoffman, Rennie Davis, Jerry Rubin and Bobby Seale), who were charged with making speeches for the purposes of inciting, organizing, promoting and encouraging a riot and conspiracy, under the 1968 Federal Anti-Riot Act.[4] The events leading to their arrest arose out of anti-Vietnam war demonstrations during the 1968 Democratic National Con-

The court may conduct the examination of prospective jurors or permit the lawyers to do so. If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask. On its own initiative or on the motion of a party, the court may provide for a prospective juror or jurors to be questioned out of the presence of the other jurors.

[4] *United States v Dellinger,* 472 F2d 340 (CA 7, 1972).

vention. The media saturated the public with reports and images of the rioting and events before and during trial.

In reversing their convictions, the United States Court of Appeals for the Seventh Circuit held that the voir dire should have included at least minimal inquiry into three areas, including anti-Vietnam war sentiment, attitudes regarding "hippie" culture, and juror attitude concerning confrontation between city police and demonstrators. General questions regarding attitudes, associations, family, and employment status were not sufficient to test a juror's possible prejudice, in a specific area where it might well exist.[5]

The Supreme Court of Hawaii reversed a conviction in a highly publicized armed robbery case, because the judge relied entirely on juror self-assessment of impartiality. There was significant publicity before and during trial, including photographs of defendants in handcuffs and reports of repeated outbursts in the courtroom, together with news articles that defendants led a gang responsible for recent robbery-murders in the community. *State v Pokini,* 55 Hawaii 640, 642-644; 526 P2d 94 (1974). The court found that the professed ability of jurors to set aside views resulting from the publicity, without more, did not adequately protect defendants' right to an impartial jury.[6]

The need for attorney participation in voir dire becomes apparent on comparison of the court's general, superficial questions with the carefully constructed questions submitted by Tyburski's lawyer that sought to elicit specific, probative responses concerning issues often difficult to articulate, let alone acknowledge, in a courtroom. The general, superficial questions posed by the court eli-

---

[5] *Dellinger,* n 4 *supra,* p 369.

[6] *United States v Lewin,* 467 F2d 1132 (CA 7, 1972).

cited similarly superficial, and therefore unenlightening, responses from prospective jurors.

National models of criminal procedure provide for lawyer conduct of voir dire.[7] Lawyer-conducted voir dire examination would have resulted in more complete factual development, leading to a more fully informed exercise of the rights of challenge. Questions should be closely related to the factual circumstances of the case. Lawyers review the facts and circumstances of the case over a period of days, weeks or even months. The judge, of necessity, allots but limited time and attention to

[7] The following standards recognize the need for attorney questioning during voir dire:
—ABA Standard 15-2.4, quoted *post*, p 668, n 17.
—National Prosecution Standards, 17.2 Jury Selection:

> Initial examination of jurors as to statutory qualifications may be conducted by the court; thereafter examination should be conducted by counsel.
> Voir dire examination should not be conducted solely by the court since "there are always points in practically every case which are peculiar to that case, and which, by the same token, are unknown to the trial judge, but known to defense counsel and the parties." Bias, preconception and prejudice are ever present, and they can and will affect a verdict. There is no foundation in reason, therefore, for placing these things beyond the thorough examination by counsel. [National Prosecution Standards, commentary, p 235.]

—Uniform Rules of Criminal Procedure, Rule 512(b):

> Examination. . . . The court may put to the prospective jurors appropriate questions regarding their qualifications to serve as jurors in the case, and shall permit questioning by the parties for the purposes of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges. [10 ULA 261, 1992 Special Pamphlet, p 125.]

The United States Supreme Court has declined to require submission of content questions to jurors in state criminal proceedings although there has been significant pretrial publicity. The Court, acknowledging that the ABA standards may represent the "better" view, ruled that that does not mean that they are incorporated into the Fourteenth Amendment. *Mu'Min v Virginia,* 500 US 415, 430-431; 111 S Ct 1899; 114 L Ed 2d 493 (1991).

review before the trial of the facts and circumstances.

If the rights of challenge are not to be empty, a litigant should be permitted sufficient inquiry into the background and attitudes of the jurors to enable intelligent exercise of those rights.[8] The trial court deprived Tyburski of the benefit of his lawyer's preparation and knowledge of the facts and circumstances. She was prevented from using that knowledge to assist the court in selecting an impartial jury.

Permitting attorney-conducted voir dire in appropriate cases need not result in abuse. The trial court retains the right to limit questions to appropriate information, and has the power to protect potential jurors from burdensome, harassing, or embarrassing questions.

III

In cases subject to intense media exposure, the prejudice arises in part from a juror's familiarity with details of the crime before the trial. Each juror is obliged to set aside "knowledge" gleaned from the media. The risk of prejudice should be evaluated by the degree to which pretrial publicity lodges preconceptions in the minds of prospective jurors. A defendant is deprived of his right to a fair trial when the trial court fails to sufficiently protect the accused from the results of pretrial publicity.[9]

---

[8] *United States v Dellinger,* n 4 *supra,* p 368.

[9]  Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. [*Sheppard v Maxwell,* 384 US 333, 362; 86 S Ct 1507; 16 L Ed 2d 600 (1966).]

Refusal to ask questions posed by the defense does not require reversal; "[r]ather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."[10] To satisfy federal and state constitutional concerns, the trial court must ask questions designed to elicit responses that will uncover latent biases, and selection of a jury competent to render a verdict free of extrajudicial influence.

The trial court's cursory questioning in the instant case was inadequate to protect Tyburski from the wave of publicity aired just before the trial.[11] Most of the news articles appeared in Janu-

[10] Mu'Min, n 7 supra, pp 425-426, citing Murphy v Florida, 421 US 794; 95 S Ct 2031; 44 L Ed 2d 589 (1975).

[11] The following are a sampling of headlines and dates. "Woman missing since '85 found in freezer," January 3, 1989, Detroit Free Press; "Woman discovered in freezer was beaten, Police seek answers in 3-year-old slaying," January 5, 1989, Detroit Free Press, Section A, pp 3, 4; "Daughter's suspicions of freezer deepened," January 6, 1989, Detroit Free Press, Section A, pp 3, 4; "Husband: We fought, she fell into the freezer, Statement to police says she threw knife," January 7, 1989, Detroit Free Press, Section A, pp 3, 14 (the latter article discussed Dorothy Tyburski's affair with her daughter's boyfriend, and Tyburski's statements to police). Similar articles appeared in the New York Times, Detroit News, and Plymouth Observer throughout January and February, 1989.

On April 23, 1989, the Detroit Free Press ran a lengthy article on the Tyburski family, complete with historical details of family discord and Tyburski's lies to explain his wife's three-year absence, including the following:

Leonard Tyburski did more than kill his wife. According to his confession the day of his arrest, he slammed her head against a concrete pole in the basement after she came after him with a steak knife, while taunting him with news that she had had sex with Kelly's 18-year-old boyfriend. Once she was dead, he twisted her bloodied 5-foot-4, 135-pound body and stuffed it into the family freezer, atop frozen hamburger and kielbasa. Dorothy Tyburski's neatly made-up face, now gashed, was pressed against the side of the freezer; she was barefoot, and wore jeans and a gray Hall & Oates T-shirt Kelly had bought her.

Within minutes after his wife's death, Tyburski began a complex psychological game, telling his wife's relatives elaborate lies, convincing his oldest daughter, Kelly, the inquisitive one, that her mother had left because she hated Kelly.

ary and February, 1989. All three local television news stations ran stories on March 2, 1989, the day of Tyburski's preliminary examination. The trial began on June 19, 1989, when the lurid details from media reports were still fresh in the public's mind.[12]

I join in affirmance of the decision of the Court of Appeals.

Boyle, J. (*concurring in the result*). To the extent that the lead opinion could be read to require trial courts in high publicity cases to allow attorneys to: (1) submit questionnaires to potential jurors, (2) participate in voir dire, or (3) conduct sequestered voir dire, I respectfully disagree. Cf. Mallett, J., *ante* at 623-624. Likewise, I disagree with the Court of Appeals cumulative-error analysis suggesting that the collective decisions of the court—failing to conduct a sequestered voir dire and not allowing counsel to meaningfully participate in voir dire—deprived the defendant of a fair trial. Cf. 196 Mich App 576, 590; 494 NW2d 20 (1992).

Nevertheless, I join in Justice Mallett's result for the sole reason that the record supports the conclusion that counsel asked the court to question venire members about what they had heard or

See *Jordan v Lippman,* 763 F2d 1265 (CA 11, 1985), where the United States Court of Appeals for the Eleventh Circuit reversed a conviction because the trial court had failed to conduct a searching and extensive voir dire in light of massive publicity concerning a racially charged public demonstration that had occurred just three days before the trial.

[12] Jury selection long after a barrage of pretrial publicity has been held to be a significant factor in denying habeas relief. *Patton v Yount,* 467 US 1025; 104 S Ct 2885; 81 L Ed 2d 847 (1984). Lapse of time is crucial in softening the prejudicial effect of pretrial publicity, as community sentiment softens, details of the case slip from the public's mind, and even jurors who once held preformed impressions of guilt or innocence may have weakened or eliminated convictions once held. *Id.,* pp 1032-1034.

remembered from pretrial publicity, and the court did not do so.

What a prospective juror knows and remembers about an incident is of great significance in exercising challenges. However, a request for content questions, meaning questions about the content of the publicity to which potential jurors have been exposed, creates an obvious dilemma for the trial court and defense counsel. Where potential jurors are not sequestered during voir dire, as all agree they need not be, these questions pose the risk that the revelation of some detail might either cause the entire process to be aborted, or else furnish the basis for appellate claims based on jury taint or ineffective assistance of counsel. A trial court can only avoid these dangers completely by conducting sequestered voir dire of each member of the venire who acknowledges exposure to publicity (in this case, all but two of them), which is not required as a matter of law, or, when individualized voir dire is denied, by confirming on the record that counsel does not desire content questions directed to the entire panel.

Because trial counsel runs the risk that asking such questions will reinforce specific details or negative impressions that other panel members gained from pretrial exposure, counsel may deliberately forgo asking content questions for sound strategic reasons. For example, defense counsel's mid-voir dire request that the court refrain from asking potential jurors to state their opinions about the case was clearly a strategic decision designed to minimize the effect of panel members' opinions on the rest of the venire. For that reason, the superficiality of the compound question that was prompted by this request cannot form the basis for error.

The record does not permit the same conclusion,

however, with respect to questions regarding what the venire members remembered about pretrial publicity. I concur with Justice MALLETT's result because the extensive amount of pretrial publicity counseled special caution, and I cannot say with confidence that counsel elected to forgo content questions, which she asked for, but were not presented.

BRICKLEY, J. (*dissenting*). Because we would conclude that the trial court did not abuse its discretion in placing limitations on the voir dire conducted in this case, we respectfully dissent.

I

It is undisputed that on September 28, 1985, defendant Leonard Tyburski inflicted fatal injuries on his wife in the basement of their home. He stored her body in the locked basement freezer for approximately three years, until the body was discovered by one of his daughters on January 2, 1989. Tyburski was arrested on that same day and charged with open murder. Following the preliminary examination on March 2, 1989, he was bound over for trial on a charge of second-degree murder.

Extensive pretrial publicity surrounded the unfolding of these events, stemming mostly from the manner in which the defendant had disposed of the body and the circumstances attending the discovery of the body. Ample media coverage was also given to an alleged affair between the decedent and her daughter's boyfriend. On the international level, two British tabloids followed the case. On the national level, stories of the case appeared in the New York Times, USA Today, and the National Enquirer. Journalists from Arizona, Florida, and Pennsylvania, among other states, had

called requesting information about the case. On
the local level, stories appeared in the Detroit Free
Press, the Detroit News, and the Plymouth Ob-
server, including an article that appeared in the
April 23, 1989, Sunday magazine of the Detroit
Free Press, entitled, "I found Mom!" On the basis
of this pervasive pretrial publicity, defense counsel
moved for individual sequestered voir dire and for
submission of a questionnaire to all prospective
jurors designed to determine the extent of their
exposure to such publicity.[1] The trial court denied
these requests.

At trial, the sole issue was the level of defen-
dant's culpability. In an attempt to mitigate the
crime to manslaughter, defendant raised a defense
of provocation. This was premised on the fact that

---

[1] The questionnaire provided, in pertinent part:

This case has received some news coverage during the past 6
months . . . .
7. Do you remember reading or hearing about this case at
all?
—Did you read articles about it?_____;
—How many do you think you read?_____;
—Where did the article(s) appear? (Please be specific, if
possible)
—What do you remember from reading those articles?
8. Did you see television coverage of this case?_____;
—What stands out in your mind about what you saw on TV?
9. Did you talk about this case with family, friends or co-
workers?
—What stands out in your mind about what was discussed?
10. After hearing about this case, what was your reaction?
11. Did you form an opinion about anything connected to
this case? If so, what was your opinion?
12. Do you understand that none of what you read or heard
before coming to trial is evidence in this case?
13. Do you realize that much of what you may have heard or
read may not even be true?
14. Have you ever heard the saying, "you can't believe
everything you read in the papers?" Do you agree with this?
15. If selected as a juror, will you promise to refrain from
being exposed to any further news coverage during this case?

the murder occurred following an argument between the defendant and the decedent, an argument precipitated by the decedent's admission that she was having an affair with her daughter's boyfriend. Defendant testified that following this admission, the decedent began throwing food containers at him and lunged at him with a knife. This sequence of events triggered his actions in smashing her head against a beam in the basement, resulting in her fatal injuries.

The jury rejected defendant's defense of provocation and convicted the defendant of second-degree murder. Defendant was sentenced to a term of twenty to forty years. On direct appeal, the Court of Appeals reversed the defendant's conviction, concluding that the trial court had abused its discretion in limiting the scope and conduct of voir dire, resulting in a deficient voir dire.[2] It held that the cumulative effect of the trial court's refusal to conduct sequestered voir dire, its failure to allow meaningful participation by defense counsel in the jury selection, and the absence of probing questions on voir dire prevented defendant from receiving a fair trial. Because we disagree with the majority's affirmance of the decision of the Court of Appeals, we dissent.

II

The analysis of the lead opinion focuses solely on the conduct of the jury voir dire in the context of the pretrial publicity. Accordingly, we must carefully examine the transcript of the voir dire and the content of the pretrial publicity within the context of the recognized purposes of voir dire.

[2] 196 Mich App 576; 494 NW2d 20 (1992).

A

Jury voir dire began on Monday, June 19, 1989. As stated above, the court had earlier denied defense counsel's requests for individual sequestered voir dire and submission of a questionnaire to prospective jurors. The trial judge informed counsel that it was his practice to conduct the voir dire.[3] The court responded negatively to defense counsel's question pertaining to whether follow-up questions by counsel would be allowed. However, the court indicated to counsel that if a juror's response demonstrated a need for follow-up questions, counsel could submit such questions in writing to the judge and he would present them to the prospective jurors. Additionally, defense counsel requested that the trial court question potential jurors individually if it appeared that many had been exposed to pretrial publicity. The court expressed its intention to comply with this request.

The jury array was composed of eighty persons. After questioning prospective jurors regarding potential bias stemming from previous encounters

[3] In Michigan, the conduct of voir dire is a matter within the trial judge's discretion. See MCR 6.412(C), which provides in pertinent part:

(1) Scope and Purpose. The scope of voir dire examination of prospective jurors is within the discretion of the court. It should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges. The court should confine the examination to these purposes and prevent abuse of the examination process.

(2) Conduct of the Examination. The court may conduct the examination of prospective jurors or permit the lawyers to do so. If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask. On its own initiative or on the motion of a party, the court may provide for a prospective juror or jurors to be questioned out of the presence of other jurors.

with the law or knowledge of one of the parties or witnesses in the case, the trial judge proceeded to the issue of pretrial publicity. Initially, the trial judge asked to see a display of hands by each person who had heard or seen something about this case. Every prospective juror responded. Beginning with the first juror, the judge asked, "how do you recall hearing something about this case?" When the juror responded that she had read about the case in the paper and had seen news coverage on television, the trial judge stated:

> All right. You understand, [name of juror], that if you are selected to sit as a juror in this courtroom, that you have to decide this case on what you hear in the courtroom; you understand that, don't you.

Following an affirmative response by the juror, the trial judge stated:

> All right. If you are selected as a juror, what you are going to have to do, [name of juror], is basically separate what you have heard on TV or on the radio or in the newspaper and judge this case on what you hear in the courtroom. Have you developed any opinions thus far or feelings on this case one way or another as to what you've heard or read?

The juror responded that she had and that she tended to think the defendant was guilty. Following this disclosure, the trial judge inquired:

> All right. Do you believe everything that you read in the newspaper?

When the juror responded in the negative, the trial judge implored:

Okay. Do you think that that is a way to settle disputes as to guilt or innocence by reading the newspaper?

Upon receiving a negative response, the trial judge continued:

Okay. If I were to tell you, [name of juror], that you have to decide this case based on what you hear in the courtroom, will you be able to set aside your beliefs, set aside your opinions and listen to this case and render a fair decision?

The juror responded in the negative. The trial judge followed up with:

No. Do you think what you've read thus far has tainted you to such a degree that you do not think that you could be fair to this defendant?

Upon receiving an affirmative response, the trial judge ended this line of questioning (this juror was later excused by the trial judge) and moved on to another prospective juror.

During questioning of the next several prospective jurors, the trial judge inquired whether any feelings or opinions had been developed about the case. An affirmative response triggered a follow-up question by the judge regarding whether the prospective juror could set aside personal opinions and try the case solely on the evidence presented in the courtroom. After having excused several jurors for cause on the basis of their firmly held opinions, this exchange occurred:

*The Court:* Okay. As a result of what you have heard and read, have you formulated any opinions?
*Juror Zimmer:* Well, I'm afraid I would have to say I did.

*The Court:* Okay. And these opinions are not favorable toward Mr. Tyburski?

*Juror Zimmer:* That's right.

*The Court:* Okay.

*[Defense attorney]:* May we approach for a moment, your Honor?

*The Court:* All right.

(Off the record discussion was had.)

*The Court:* You understand, Ms. Zimmer, don't you, as I've discussed earlier that this case is going to be decided in the courtroom; isn't that correct?

*Juror Zimmer:* Yes.

*The Court:* You understand that?

*Juror Zimmer:* Yes.

*The Court:* And you don't believe that case[s] should be decided by the media, do you?

*Juror Zimmer:* No, I don't.

*The Court:* You don't believe that cases should be decided by what you read in the newspaper, do you?

*Juror Zimmer:* No.

*The Court:* You don't believe that cases should be decided on what you hear or say [sic] on the TV; isn't that correct?

*Juror Zimmer:* That's right.

*The Court:* Okay. But you are telling me that you've developed such a strong opinion that you'd have a hard time being a fair juror; is that correct?

*Juror Zimmer:* Well, I would have a rough time, I think.

*The Court:* You'd have a rough time?

*Juror Zimmer:* Yes, I believe I would.

*The Court:* Even though you believe that cases shouldn't be decided on what you heard and read in the newspapers?

*Juror Zimmer:* I realize that . . .

*The Court:* You don't know if what you've read is accurate, do you? There's no way for you to know that; isn't that correct?

*Juror Zimmer:* That's true.

At the conclusion of this exchange, juror Zimmer was excused for cause. Immediately following this, juror Louis admitted she had read about the case and formulated an opinion concerning what she had read.[4] The following exchange transpired:

> *The Court:* Okay. Do you understand that if you are selected to sit as a juror in this case that you have to decide the case on what you hear in the courtroom?
> *Juror Louis:* Yes.
> *The Court:* And will you be able to do that?
> *Juror Louis:* Yes.
> *The Court:* Will you be able to set aside the opinions that you've developed in the newspapers and judge this case on what you hear in the courtroom?
> *Juror Louis:* Yes.

Receiving this response, the trial judge proceeded to question the next prospective juror.[5] The morning session of the voir dire continued in similar fashion, with the trial judge asking every potential juror whether he had formed any opinions about this case, and inquiring into the substance of any opinions admittedly formed.

At the conclusion of the morning session, defense counsel filed a motion objecting to the Court's voir dire procedure. Counsel argued that the Court's procedure in inquiring into whether any juror had formed an opinion regarding defendant's guilt and its inquiry into the substance of this opinion served only to taint any prospective juror who either had not yet heard about the case or had failed to form an opinion about defendant's

---

[4] It is unclear from the transcript whether juror Louis had formed an opinion regarding defendant's guilt.

[5] Juror Louis was later excused on a peremptory challenge by the defendant.

guilt or innocence. Counsel further claimed that the voir dire process "has been more prejudicial to [defendant's] right to a fair trial by an impartial jury than had the Court asked no questions whatsoever about publicity." Counsel then requested that any extended questioning of jurors regarding their opinions be conducted individually and outside the presence of every other prospective juror.[6]

After the lunch break, voir dire continued with prospective juror Rae. Following an affirmative response to an inquiry into whether he had heard about the case, the trial judge queried whether he

---

[6] Defense counsel's motion, in its entirety, is as follows:

Now comes Leonard Tyburski, by and through his attorney . . . and hereby vehemently objects to the voir dire procedure employed by this Court thus far during the morning session of the first day of jury selection. The Court's procedure, in eliciting from each jury [sic] not only whether they have an opinion as to this case, but additionally what that opinion is, has the effect of tainting any juror who had not yet heard news accounts or who had not yet formed an opinion as to defendant's guilt or innocense [sic].

Given the percentage of panelmembers who have been exposed to news reports (approximately 100 per cent), and given the almost unanimous decision by those persons who have read such accounts that Mr. Tyburski is guilty of murder, to continue this procedure simply cements in the minds of the yet undecided the "consensus" in the community as to the "appropriate" verdict. Moreover, now that potential jurors have been indoctrinated with the community's perception of the case, they are now under much more pressure to convict Mr. Tyburski.

Mr. Tyburski contends that the Court's voir dire process thus far has been more prejudicial to his right to a fair trial by an impartial jury than had the Court asked no questions whatsoever about publicity. He requests again that any extended questionning [sic] of jurors regarding opinions they have reached about the case be conducted individually, sequestered from the rest of the panel.

Defendant raises this objection now, prior to the commencement of the afternoon session, rather than at the end of the day (as suggested by this Court) in hopes of shielding any remaining impartial panel members from the enormous taint of this process.

had "developed any *opinions* that would make [him] an *unfair* juror?" (Emphasis added.)

The trial judge proceeded to question prospective jurors in this manner, but generally included such additional inquiries into whether a prospective juror would "be able to give this defendant all his constitutional guarantees?" and whether there was any reason why such juror could not sit as an impartial juror, despite having been exposed to pretrial publicity.

At the conclusion of the judge's questions regarding the effect of the pretrial publicity on the prospective jurors, it appears defense counsel reminded the judge that he had not inquired into whether prospective jurors had read the article published in the Sunday Free Press magazine, entitled, "I found Mom!" It seems defense counsel also requested the judge to probe the source of the prospective jurors' knowledge of the case.[7] The trial judge immediately requested a showing of hands by those prospective jurors who had read this article. He then asked how many prospective jurors had heard about the case only on television and how many had read about it only in the newspapers. Finally, he asked how many prospective jurors had heard about this case on the radio.

After covering other areas of potential bias, the trial judge asked if counsel had any written questions it wished to have submitted to the jury. This colloquy ensued:

> [*Defense Counsel*]: No, your Honor, just the ones that I have submitted.
> *The Court:* All right. I have gone through those.

---

[7] Because some of these questions were included in defendant's proposed questionnaire and because the court engaged in this inquiry following a discussion off the record requested by defense counsel, it appears that defense counsel was the impetus behind such questioning. See n 1.

Those that I did not ask I did not deem to be relevant. But if you want to make those questions part of the file, I will give you that opportunity, counsel.

Following this, defense counsel passed on challenges for cause.

As peremptory challenges were exercised and new prospective jurors were selected to fill the vacant seats, the trial judge inquired whether any juror had heard about the case. Upon receiving an affirmative response, the judge engaged in an examination designed to determine whether any opinions had been formed that would create the potential for unfairness in a prospective juror. This examination was tailored to accommodate defense counsel's concern, as expressed in her motion at noon objecting to the voir dire procedures, that the questions posed by the trial judge in the morning session prompted answers that had the effect of tainting the remaining members of the venire. On one occasion, defense counsel requested and was given permission to submit a follow-up question to a juror. On several other occasions, defense counsel successfully interjected desired questions into the voir dire.[8]

---

[8] Questions interjected by defense counsel include the following:

*A juror:* I have some moral opinions of my own regarding several of those items. I'm not—I can't judge at this time morally—his moral . . .

[*Defense counsel*]: Your Honor, can we break down those topics that you went through so we can . . .

*The Court:* Okay. Go ahead.

\* \* \*

*The Court:* Okay. Any challenges for cause?

[*Defense Counsel*]: Your Honor, before we do that, adolescent daughter.

*The Court:* Adolescent daughters, teenage daughters?

*Juror Moynihan:* No. I have a 17 and [a] 20-year old boys [sic].

After having exercised only eight of the allotted twenty peremptory challenges, defense counsel announced it would have no further challenges. Instead, defense counsel submitted a motion for a mistrial the following day on the basis of the court's procedure in conducting voir dire.[9] Defense counsel argued that requesting prospective jurors to verbalize their opinions in front of other prospective jurors served to taint the panel. Counsel informed the judge that although she did not feel this was an impartial jury, she was declining to exercise further peremptory challenges because such challenges would not have cured the faulty procedure.

B

Analyzing the pretrial publicity in the case at bar, we note, as stated above, that this case attracted both national and international media attention, as well as substantial local publicity. This publicity, however, was mainly factual;[10] it focused

[9] The pertinent parts of the motion are as follows:

I do have a motion with respect to the Court's procedure for conducting voir dire yesterday. I have a motion for mistrial.

I believe that the Court's procedure and, number one, asking the jurors whether they had an opinion. But more importantly having them to verbalize what their opinion was in front of other jurors tainted the panel.

I have expressed in various briefs how I think that that procedure causes other jurors to maybe hear the opinions of other people on the panel, their fellow jurors and that that taints the process.

We had virtually everybody on this panel had [sic] heard about this story. But I think when a juror says in front of fellow jurors that they have received information about this case and that based upon that information they believe that Mr. Tyburski is guilty. That's a very, very powerful statement to hear. And I don't know that any juror can ignore that and be impartial after hearing that.

[10] The lead opinion takes issue with our characterization of the

on the bizarre facts of the case, many of which were revealed at trial. Emphasis was placed on the body being found in the freezer, three years after the date of death and on the daughter's discovery of the body. One article implied that defendant was "severely sociopathic." Another story was entitled, "Woman may have been alive when locked in freezer." Although evidence adduced at trial confirmed that the decedent *may* have had some vital signs when she was locked in the freezer, testimony by the medical examiner revealed that the decedent could not have been alive for longer than several minutes following the severe head injuries she sustained. While there was evidence of some journalistic sensationalism, we note that the stories did not focus substantially on irrelevant information. Additionally, there were no stories of confessions that were later ruled inadmissible. In sum, while the publicity was pervasive, it was not necessarily inaccurate, nor was it prejudicial to Tyburski's defense.

C

Turning now to the recognized purposes of voir dire, we note there are essentially three functions of voir dire. The primary function is to elicit information from prospective jurors that establishes a basis for a challenge for cause. A second important and related function is to facilitate the intelligent use of peremptory challenges. A third function of voir dire, often viewed as illegitimate, is to educate prospective jurors on the merits and theories of the case, and to develop a rapport between jurors and attorneys. It is here that skill-

publicity as "mainly factual." This conclusion, however, is supported by a careful reading of the record. Only four of the twenty articles in the record can aptly be classified as "prejudicial" to the defendant. Many of the other articles were favorable to the defense, detailing an alleged affair between the decedent and her daughter's boyfriend.

ful defense attorneys seek to extract commitments from potential jurors; such commitments produce a biased jury instead of an objective one, and thus serve to negate the purpose of voir dire.

For this reason, the trial judge must be given considerable latitude in determining what questions will be submitted to prospective jurors. It has been stated:

> [The trial judge] must be free to exclude those questions which are "intended solely to accomplish such improper purpose" or which are not "phrased in neutral, non-argumentative form." He must also be able to "restrict the examination of jurors within reasonable bounds so as to expedite the trial." And he must on occasion be allowed to restrict questioning in order to give some protection to the privacy of prospective jurors.[11]

With this background in mind, we review defendant's federal constitutional challenge before turning our attention to the abuse of discretion argument.

### III

#### FEDERAL CONSTITUTIONAL CHALLENGE

The United States Supreme Court cases delineating the requirements of voir dire can be divided into two categories. The first includes cases that were tried in federal courts in which the court's authority stems from its federal supervisory powers.[12] The second includes cases that were tried in state courts in which the court's authority is limited to enforcing the mandates of the United

---

[11] 2 LaFave & Israel, Criminal Procedure, § 21.3, p 719.

[12] See *Rosales-Lopez v United States,* 451 US 182; 101 S Ct 1629; 68 L Ed 2d 22 (1981); *Aldridge v United States,* 283 US 308; 51 S Ct 470; 75 L Ed 1054 (1931); *Connors v United States,* 158 US 408; 15 S Ct 951; 39 L Ed 1033 (1895).

States Constitution.[13] While the Supreme Court's decisions under its federal supervisory power are instructive, they are not binding in this state criminal case. It is only that Court's constitutional decisions that are necessarily binding upon this Court.

A common theme flowing from the cases under both the federal supervisory powers and the constitution is that much discretion is vested in the trial court to determine what questions to ask on voir dire.[14] The reasons underpinning this rule were succinctly stated by the Supreme Court in *Rosales-Lopez v United States,* 451 US 182, 188; 101 S Ct 1629; 68 L Ed 2d 22 (1981):

> Despite its importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.

Cognizant of the above rule, we turn now to the

---

[13] See *Turner v Murray,* 476 US 28; 106 S Ct 1683; 90 L Ed 2d 27 (1986); *Ristaino v Ross,* 424 US 589; 96 S Ct 1017; 47 L Ed 2d 258 (1976); *Ham v South Carolina,* 409 US 524; 93 S Ct 848; 35 L Ed 2d 46 (1973).

[14] In the federal system, the trial court may conduct the voir dire examination, or it may allow the attorneys to conduct such examination. If the court chooses to conduct the examination itself, then "[t]he court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper." FR Crim P 24(a).

One study of federal judges showed that more than half conducted voir dire themselves, approximately one-third allowed attorneys to ask supplemental questions, and the rest allowed the attorneys to ask all the questions. On the state level, thirteen states follow the federal approach, twenty states give the attorneys primary control of the questioning, and seventeen states provide for the judge to begin the questioning, with the attorneys then asking additional questions. 2 LaFave & Israel, n 11 *supra,* § 21.3, p 722.

relevant federal constitutional decisions and their application to the case at bar.

A

The United States Supreme Court has grappled with the issue of pretrial publicity and its effect on the requirements of voir dire on several occasions, dating from *United States v Burr,* 8 US (4 Cranch) 470; 2 L Ed 684 (1807), to its more recent pronouncements in *Mu'Min v Virginia,* 500 US 415; 111 S Ct 1899; 114 L Ed 2d 493 (1991). In *Mu'Min,* the petitioner Dawud Mu'Min was convicted of murdering a woman while out of prison on work detail and was sentenced to death. Substantial publicity had surrounded this case, including details of the murder, the petitioner's prior record, and reports of a confession. Publicity concerning the petitioner's prior record greatly enhanced the potential for prejudice because it included a first-degree murder conviction for which defendant had been incarcerated at the time of the instant murder. It was noted that the death penalty had not been an option when the petitioner was convicted of the earlier murder; instead, he had received a forty-eight-year sentence. The petitioner's counsel requested a change of venue, but the trial court declined to rule until an attempt had been made to seat a jury.

Before the trial date, the petitioner submitted sixty-four proposed voir dire questions to the trial judge and presented a motion for individual voir dire. The trial court refused to ask any of the petitioner's questions relating to the content of the publicity to which prospective jurors had been

exposed,[15] and denied the motion for individualized voir dire. The trial court ruled that, if necessary, the venire would be broken down into panels of four to explore the issue of pretrial publicity.

Sixteen of the initial twenty-six prospective jurors admitted to having acquired knowledge about the case from the media or another source. In response to this, the court asked the following questions:

> "Would the information that you heard, received, or read from whatever source, would that information affect your impartiality in this case?
>
> "Is there anyone that would say what you've read, seen, heard, or whatever information you may have acquired from whatever the source would affect your impartiality so that you could not be impartial?
>
> * * *
>
> "Considering what the ladies and gentlemen who have answered in the affirmative have heard or read about this case, do you believe that you can enter the Jury box with an open mind and

[15] The following questions were submitted by the petitioner, but disallowed by the trial judge:

> "32. What have you seen, read or heard about this case?
> "33. From whom or what did you get this information?
> "34. When and where did you get this information?
> "38. What did you discuss?
> "41. Has anyone expressed any opinion about this case to you?
> "42. Who? What? When? Where?"

Note, though, that "[t]he trial court did ask several of the requested questions concerning prior knowledge of the case:

> "31. Have you acquired any information about this case from the newspapers, television, conversations, or any other source?
> "35. Have you discussed this case with anyone?
> "36. With whom?
> "37. When and where?" [500 US 419, n 2.]

await until the entire case is presented before reaching a fixed opinion or conclusion as to the guilt or innocence of the accused?

* * *

"In view of everything that you've seen, heard, or read, or any information from whatever source that you've acquired about this case, is there anyone who believes that you could not become a Juror, enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to the guilt or innocence of the accused?" [500 US 420.]

Following these questions, one of the sixteen prospective jurors who had admitted to having prior knowledge of the case professed an inability to be fair and was excused for cause. The petitioner moved for all prospective jurors who had been exposed to pretrial publicity to be excused for cause. The motion was denied.

The trial court proceeded to divide the prospective jurors into groups of four and conducted further voir dire concerning pretrial publicity. If a potential juror acknowledged having read or heard something about the case, the court would ask whether the juror had formed an opinion and whether the juror could be impartial. One juror was removed by the trial judge sua sponte after having equivocated in her response about whether she could enter the jury box with an open mind. Of the twelve jurors eventually chosen, eight had read or heard about the defendant's case, but none admitted having formed an opinion or being biased against the defendant.

Following his conviction and sentence of death, petitioner Mu'Min challenged his conviction on the basis of the Due Process Clause of the Fourteenth Amendment, arguing that in cases involving pretrial publicity of this magnitude, the trial

court must inquire into the contents of any news reports read by potential jurors. The Supreme Court admitted that such questions would be helpful to a defendant in exercising his peremptory challenges, but declined to make such "content" questions a constitutional requirement in cases engendering substantial pretrial publicity. It recognized that

> [t]o be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair. [500 US 425-426.]

Significantly, the Court noted that

> [w]ith respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire. [500 US 427.]

The Supreme Court concluded that there is no constitutional right to content-based questions designed to reveal the nature and extent of prospective jurors' pretrial media exposure in cases involving high publicity.

B

Applying this to the case at bar, we would hold that the trial court's failure to submit defense

counsel's questionnaire to prospective jurors did not violate the defendant's Sixth Amendment[16] right to a fair trial or his Fourteenth Amendment right of due process. Justice Kennedy, dissenting in *Mu'Min,* asserted that the trial judge must

> conduct a sufficient colloquy with the *individual* juror to make an assessment of the juror's ability to be impartial. [500 US 452. Emphasis added.]

The trial court *did* question the prospective jurors *individually* concerning whether information to which they had been exposed had led them to form opinions that would render them incapable of being impartial. Every prospective juror confessing an opinion that defendant was guilty or an inability to be fair was excused for cause. We think this is all that *Mu'Min* requires. We recognize that in *Mu'Min* the trial judge conducted further voir dire concerning pretrial publicity in panels of four. While we feel this is a salutary practice, we believe the same result was obtained in the case at bar, namely, all those jurors professing an inability to be fair were excused for cause.

C

Defendant's reliance on *Irvin v Dowd,* 366 US 717; 81 S Ct 1639; 6 L Ed 2d 751 (1961), is similarly misplaced. In *Irvin,* the defendant was convicted of murder and sentenced to death in a trial preceded by extensive media coverage that included the defendant's confession to six murders, and his offer to plead guilty if given a ninety-nine-

---

[16] The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed, . . . and *to have the Assistance of Counsel for his defence.*

year sentence in lieu of the death penalty. *Id.* at 725-726. The " 'pattern of deep and bitter prejudice' " against the defendant was evidenced by the court's attempt to seat a jury; 268 of 430 prospective jurors were excused on the basis of their preconceived opinions of the defendant's guilt. *Id.* at 727. Eight of twelve jurors who believed the defendant was guilty managed to secure positions on the jury by professing their ability to be impartial. *Id.* The Supreme Court vacated the conviction, determining that under the circumstances, such a finding of impartiality did not comport with constitutional standards. *Id.* at 728.

*Irvin* is similar to the case at bar in that there was extensive pretrial publicity, but distinguishable in that two-thirds of the jurors *seated* in *Irvin* admitted having formed opinions regarding the defendant's guilt, while in the case at bar, *none* of the *seated* jurors admitted having formed an opinion regarding defendant's guilt. The *Irvin* Court, quoting from *Reynolds v United States,* 98 US 145, 155; 25 L Ed 244 (1878), stated:

> "The theory of the law is that a juror who has formed an opinion cannot be impartial." [366 US 722.]

Although each of the seated jurors professed to be impartial, the Supreme Court concluded:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see."
> With his life at stake, it is not requiring too

much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which *two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt. [Id.* at 728. Emphasis added.]

In the case at bar, despite the pervasive pretrial publicity that surrounded defendant's trial, *no member* of defendant's jury professed a belief in his guilt before hearing any of the testimony. Consequently, *Irvin* fails to support defendant's contention that his federal constitutional rights have been violated.

### D

Defendant's reliance on *Sheppard v Maxwell,* 384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966), is likewise inapposite. In *Sheppard,* the United States Supreme Court concluded that the *combination* of the prejudicial publicity *and* the trial court's failure to control disruptive influences in the courtroom deprived the defendant of his constitutional right to a fair trial. That prejudicial pretrial publicity *alone* did not warrant a finding of a deprivation of the defendant's right to a fair trial is evident from the Court's opinion, in which it stated:

> *While we cannot say that* Sheppard *was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone,* the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that "judicial serenity and calm to which [he] was entitled." [*Id.* at 354-355, quoting *Estes v Texas,*

381 US 532, 536; 85 S Ct 1628; 14 L Ed 2d 543
(1965). Emphasis added.]

In contrast to the circus-like atmosphere in which
the *Sheppard* trial was conducted, the ambiance of
defendant's trial was one of "judicial serenity."
Accordingly, defendant's reliance on *Sheppard* is
misplaced, and it cannot be invoked to support his
claim of a constitutional violation.

E

Finally, we note that a federal constitutional
challenge to voir dire premised upon the failure of
the voir dire to conform to ABA Standards for
Criminal Justice, Trial by Jury, Standard 15-2.4
(approved August 1993)[17] cannot be sustained. In
*Mu'Min,* the United States Supreme Court held
that the ABA standards embody a stricter standard
of juror eligibility than that required under the
constitution. It observed:

Under the ABA standard, answers to questions
about content, without more, could disqualify the

[17] Standard 15-2.4 provides in pertinent part:

(d) Where there is reason to believe the prospective jurors
have been previously exposed to information about the case, or
for other reason are likely to have preconceptions, concerning
it, counsel should be given liberal opportunity to question
jurors individually about the existence and extent of their
knowledge and preconceptions.

(e) Jurors should be examined outside the presence of other
jurors on sensitive matters or prior exposure to potentially
prejudicial material.

(1) Sensitive matters are those matters which might be po-
tentially embarrassing or intrusive into the juror's private life,
feelings or beliefs, or those matters which, if discussed in the
presence of the jury panel, might prejudice or influence the
panel by exposing other potential jurors to improper informa-
tion.

juror from sitting. Under the constitutional standard, on the other hand, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." [*Id.* at 430 (quoting from *Patton v Yount,* 467 US 1025, 1035; 104 S Ct 2885; 81 L Ed 2d 847 [1984]).]

Consequently, a failure to adhere to the ABA standards, standing alone, cannot support a constitutional challenge to voir dire. Defendant's argument to the contrary must be rejected.

Accordingly, because there is no constitutional right to content-based questions in high publicity cases or to an individual, sequestered voir dire, and because of the lack of a professed belief of guilt from any one of the defendant's jurors before the trial or a circus-like atmosphere during the trial, we would reject defendant's federal constitutional challenge to the conduct and scope of his voir dire.

IV

ABUSE OF DISCRETION

We would also reject defendant's argument that the trial court abused its discretion in conducting voir dire. The majority concludes that the trial judge abused his discretion by limiting the voir dire in a manner that precluded the defendant from developing an adequate factual basis for the exercise of both peremptory challenges and challenges for cause through his refusal to submit defense counsel's questionnaire to prospective jurors and his failure to ask sufficiently probing questions. Additionally, the majority concludes that the trial judge abused his discretion by allow-

ing juror self-assessment of bias to go unchallenged.[18] We disagree.

### A

An abuse of discretion was defined in *Spalding v Spalding*, 355 Mich 382; 94 NW2d 810 (1959), and reaffirmed in the criminal context in *People v Charles O Williams*, 386 Mich 565, 572; 194 NW2d 337 (1972).

> "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." [Quoting *Spalding v Spalding, supra* at 384-385.]

The question before us necessarily becomes whether the limitations imposed on voir dire by the trial judge served to exclude a showing of facts that would provide a sufficient basis for a challenge for cause or would inhibit the reasonable exercise of peremptory challenges. In other words, were the judge's actions so "palpably and grossly violative of fact and logic" as to evidence perversity of the will, defiance of the exercise of judgment, and an exhibition of passion and bias, instead of reason.

In *Fedorinchik v Stewart*, 289 Mich 436; 286 NW 673 (1939), this Court held that the trial court abused its discretion in denying the plaintiff's

---

[18] We note that under Michigan Court Rules, both the conduct and the scope of voir dire of prospective jurors are within the trial court's discretion. See n 3.

request that prospective jurors be questioned during voir dire about whether they were insured in a mutual insurance company and, if so, which company. Such questions were relevant because attorneys from one of the largest mutual insurance companies in the area were conducting the defense, and the company paid dividends each year to its members. In view of the potential prejudice to the plaintiff, we recognized:

> It is indispensable to a fair trial that a litigant be given a reasonable opportunity to ascertain on the voir dire whether any of the jurors summoned are subject to being challenged for cause or even peremptorily. In a large measure the scope of examination of jurors on voir dire is within the discretion of the trial judge; but it must not be so limited as to exclude a showing of facts that would constitute ground for challenging for cause or the reasonable exercise of peremptory challenges. So to limit the examination is an abuse of discretion. [*Id.* at 438-439.]

In *People v Harrell*, 398 Mich 384; 247 NW2d 829 (1976), this Court was presented with a challenge to the voir dire following the trial court's refusal to submit 120 questions to prospective jurors that defense counsel had formulated to uncover latent racial prejudice. The defendant, a young African-American, was involved in an altercation with police officers, most of whom were white. He argued that the refusal to submit the proffered questions precluded a meaningful exercise of challenges for cause and an intelligent use of peremptory challenges, thus constituting a denial of his right to trial by a fair and impartial jury.

We held that the defendant's challenge must fail. Although *Ham v South Carolina*, 409 US 524;

93 S Ct 848; 35 L Ed 2d 46 (1973), mandated an
inquiry into racial bias under these circumstances,
we determined that it did *not* require the trial
judge to ask every question designed to elicit racial
bias submitted by defense counsel. We noted that
Justice Marshall, concurring in part and dissent-
ing in part in *Ham, supra* at 533, stated:

> I do not mean to suggest that a defendant must
> be permitted to propound any question or that
> limitless time must be devoted to preliminary voir
> dire. Although the defendant's interest in a jury
> free of prejudice is strong, there are countervailing
> state interests in the expeditious conduct of crimi-
> nal trials and the avoidance of jury intimidation.
> These interests bulk larger as the possibility of
> uncovering prejudice becomes more attenuated.

The *Harrell* Court noted that Justice Marshall, in
a footnote, had expressed his agreement with the
majority's assertion that "the judge may properly
decline to ask the questions in any particular form
or ask any particular number of questions on a
subject." *Id.* at 533, n 2.[19]

A similar result was obtained in *People v Cole,* 8
Mich App 250; 154 NW2d 579 (1967), rev'd on
other grounds 382 Mich 695; 172 NW2d 354 (1969),
in which the trial court refused to submit to the

---

[19] Numerous Michigan Court of Appeals decisions have applied this
principle. See *People v Furman,* 158 Mich App 302; 404 NW2d 246
(1987) (No error was found in the trial court's failure to conduct voir
dire on the basis of ninety questions submitted by the defendant);
*People v Prast (On Rehearing),* 114 Mich App 469, 482; 319 NW2d 627
(1982) ("[a] trial judge does not err when he fails to ask specific
questions requested by a defendant but does cover the area in another
manner"); *People v Hoffmeister,* 52 Mich App 219, 222; 217 NW2d 58
(1974), rev'd on other grounds 394 Mich 155; 229 NW2d 305 (1975)
(the trial judge refused to allow twelve of defendant's forty-two
proposed voir dire questions, but the record revealed that similar
questions were asked. "[T]he trial judge does not have to allow a voir
dire question to be asked in the precise language in which it was
submitted by counsel." 52 Mich App 222.).

prospective jurors twelve of seventeen questions proposed by defense counsel. The Court of Appeals determined that the seventeen questions were designed to elicit only four types of information. It concluded that such information had either been gleaned from the trial court's questioning of prospective jurors, or that the need for such information was not sufficiently compelling to support a claim of error by the trial court.

An abuse of discretion was found in *People v Taylor,* 195 Mich App 57; 489 NW2d 99 (1992). In this case, the trial court refused to question prospective jurors about their attitudes toward self-defense and the use of deadly force, despite the fact that the defendant was asserting self-defense as an excuse for shooting her husband in the face. Given the nature of the defense, the prospective jurors' attitudes on self-defense were critical. Consequently, the court's refusal was found to be an undue restriction on voir dire constituting an abuse of discretion.

A similar result obtained in *People v Sears,* 88 Mich App 1; 276 NW2d 496 (1979), in which the defendant's jury was selected three weeks before trial. During the interval between the date of selection and the date of the trial, various members of the defendant's jury sat on juries in other criminal cases. Despite this, defense counsel was denied an opportunity to conduct voir dire of the jury on the day of the trial. The Court of Appeals held that this procedure "improperly restricted defendant's ability to conduct a voir dire of the jurors and engage in the reasonable exercise of challenges." *Id.* at 3.

The general rule we would distill from these cases is that a trial court does not abuse its discretion when it declines to submit questions to prospective jurors that are designed to reveal sub-

stantial prejudices, or to develop a rational basis for the exercise of challenges, as long as the trial court employs similar questions that adequately cover the area of potential bias.

B

Applying this rule to the case at bar, we would hold that the trial court's failure to submit the questionnaire to prospective jurors did not constitute an abuse of discretion. Although the questionnaire was designed to elicit information that would have been beneficial to counsel in exercising both its challenges for cause and its peremptory challenges, we cannot conclude that the refusal to submit the questionnaire amounted to a "perversity of the will," a "defiance of the exercise of judgment," or the exercise "of passion and bias, instead of reason." Rather, we believe that the questions propounded by the trial judge were sufficiently probative, and that the trial court's actions in this matter did not even approach the high threshold marking an abuse of discretion.

Our conclusion is bolstered by an examination of the record. Contrary to the conclusions of the lead opinion and the Court of Appeals, we believe that the questions asked by the trial judge were sufficiently probative. We note that the trial judge *did* inquire whether each prospective juror had read or heard about the case and *did* request prospective jurors to raise their hands in response to a question fashioned to identify the source of their information. While lacking the depth of insight that the questionnaire may have provided, these questions produced information similar in kind to that which questions seven and eight on the questionnaire were designed to elicit.

Additionally, the trial court *did* question prospective jurors about any preconceived opinions

held by them, with the result that no juror on the actual jury had admitted having formed an opinion regarding defendant's guilt. Although it is clear that some jurors enjoyed a more abbreviated form of questioning than that endured by their fellow venire persons, this does not necessarily require the conclusion that the abbreviated questioning was sufficiently lacking in probativeness to warrant a new trial.[20]

We acknowledge that the trial court's use of the compound question, "have you developed any *opinions* that would make you an *unfair* juror," invited a single negative response that served only to leave counsel guessing with regard to whether an opinion had been formed by a juror who still felt able to judge impartially, or, alternatively, that no opinion had been formed. Despite this, we would decline to find error requiring reversal in the trial court's use of this question in the case at bar. Our reasons for this conclusion are threefold. First, we note that only nine jurors were presented with the dilemma of answering this question,[21] and of these, only five remained on the final jury.[22] Thus, the potential prejudice to the defendant in this situation is minimal. Second, we believe that defense counsel could have mitigated this potential harm by requesting the judge to clarify the question to

[20] The lead opinion's reliance on *Silverthorne v United States,* 400 F2d 627, 631 (CA 9, 1968), is misplaced. A careful reading of *Silverthorne* compels the conclusion that it was the inadequate nature of the voir dire *in light of the prejudicial nature of the publicity* that led the court to conclude that an abuse of discretion had occurred. Inadmissible evidence and allegations that the defendant had been charged before the Senate with "certain unspecified crimes" had surfaced in the media before the trial in *Silverthorne,* while the pretrial publicity in *Tyburski* contained neither inadmissible evidence nor allegations of uncharged crimes.

[21] These include jurors Palmer, Lazarski, Goodwin, Caldwell, Rae, Stewart, Wilson, Parker, and Hayden.

[22] Those remaining on the jury included jurors Goodwin, Wilson, Rae, Caldwell, and Palmer.

which a negative response applied.[23] In light of the
trial judge's earlier treatment of a follow-up ques-
tion presented by defense counsel, we presume the
trial judge would have honored this request.[24]
Third, and most importantly, we believe that de-
fense counsel's motions surrounding the voir dire
compel the conclusion that, within the context of
the trial court's refusal to grant sequestered voir
dire, defense counsel received exactly what she
had requested: questions designed to identify those
jurors possessing an inability to be impartial with-
out eliciting the information giving rise to the
juror's admitted bias.[25] Although defense counsel
initially requested a probing voir dire of jurors'
media exposure, counsel appears to have changed
tactics following her realization that a sequestered
voir dire was not forthcoming. Under these cir-
cumstances, we believe appellate counsel's argu-
ment that it was fundamentally unfair to utilize a
compound question[26] in determining whether pro-

---

[23] We note that the trial court's use of this compound question
began immediately after defense counsel's lunchtime motion objecting
to the voir dire procedures employed, a motion in which defense
counsel argued that the "voir dire process thus far has been more
prejudicial to [defendant's] right to a fair trial by an impartial jury
than had the Court asked no questions whatsoever about publicity."
We believe that the use of this compound question may have been an
attempt by the trial court to accommodate defense counsel's concerns
about the potential taint to the venire engendered by the responses
given to the questions utilized during the morning voir dire. Under
these circumstances, it may be that the compound question that the
defense now criticizes was in fact acceptable to counsel at the time it
was propounded.

[24] Despite our dissent in this case, we caution that compound
questions concerning a potential juror's preconceived opinions and
ability to be fair should not be employed in high publicity cases,
where the probability of a prospective juror having formed an opinion
is greater than in those cases involving relatively little publicity, and
where counsel's need to be apprised of such an opinion exists indepen-
dent of his need to know whether a prospective juror can remain
impartial.

[25] See n 23.

[26] Namely, "Have you developed any opinions that would make you
an unfair juror?"

spective jurors possessed preconceived opinions concerning defendant's guilt is without merit.[27] We would not countenance appellate counsel's attempt to premise error on the trial court's actions that were precipitated by defense counsel's motion, and designed to accommodate defense counsel's concerns.[28]

Finally, we note that the trial court did allow written submission of follow-up questions by counsel. That counsel failed to utilize this procedure should not now be used to support the conclusion that voir dire was insufficiently probative.[29]

Accordingly, because we believe the questions propounded by the trial court were sufficiently probative and elicited information similar in kind to that which the questionnaire would have provided, we would reject defendant's argument and conclude that neither the trial court's questioning regarding media exposure nor its refusal to submit

[27] The lead opinion suggests that this question is "ambiguous and suggests the answer that the court was looking for." *Ante* at 627-628. It neglects to note, however, that this question was employed only after defense counsel criticized the trial court for allowing jurors to elaborate on their opinions regarding defendant's guilt before the entire venire. Although we recognize that defense counsel was attempting to obtain sequestered voir dire, we believe defense counsel's motion could be interpreted as containing alternative requests. If sequestered voir dire were not forthcoming, alternatively, defense counsel would prefer that the trial court refrain from asking potential jurors to expound on their opinions in this case.

[28] The lead opinion asserts that "follow-up questions that were more probing into the source and nature of the exposure of each juror were essentially precluded." *Ante* at 626, n 11. We believe that such questions were not precluded by the trial court, but rather, were avoided by defense counsel, who declined to pursue further inquiry along these lines once it had been determined that such inquiry would not take the form of her proposed questionnaire. Our view is consistent with defense counsel's motions reflecting her belief that such questions served only to taint the panel. See ns 6, 9.

[29] On one occasion, defense counsel requested that a follow-up question be submitted to a juror. The trial court allowed counsel to submit the question *directly* to the juror. On several other occasions, defense counsel succeeded in interjecting desired questions into the voir dire. See n 8.

defendant's proposed questionnaire constituted an abuse of discretion.

C

We would also conclude that the trial court did not err in allowing juror self-assessment of bias to go unchallenged. We are not unmindful of the problems underlying juror self-assessment. In a study of a highly publicized murder case, seventy-five percent of the persons surveyed, whose awareness of the case enabled them to supply details, were no less likely to feel they could hear the evidence with an open mind than those persons who could not supply details.[30] This profession of impartiality, however, is undermined to some extent by the revelation that those persons remembering details were more likely to align with the prosecution, although they believed it less likely that the defendant could receive a fair trial.

While we acknowledge that juror self-assessment of bias may be problematic and caution the trial courts to guard against such self-serving or unwitting declarations of impartiality, we note that, in this case, the trial court appeared to be cognizant of the problems inherent in juror self-assessment of bias. This is evidenced by the exchange between the court and juror Shirlen. Juror Shirlen admitted having formed an opinion, but stated she could set aside such an opinion and give the defendant all his constitutional guarantees. Upon further questioning by the trial judge, however, she admitted being morally opposed to killing, and felt that, given her position in a Christian high school for the last twenty-five years, she was "not positive"

[30] Carroll, *Free press and fair trial: The role of behavioral research,* 10 Law & Human Behavior 187 (1986).

that she could give the defendant "a fair trial."[31]
While this illustrates the defendant's point that
judges must carefully guard against inaccurate
juror self-assessment, it also establishes that *in the
case at bar,* the trial judge employed such precautions.[32]

Accordingly, we would reject defendant's argument that the trial court erred in allowing juror
self-assessment of bias to go unchallenged and
would conclude that the trial court was in fact
cognizant of and attentive to the problems underlying juror self-assessment of bias.

D

We would also hold that the trial court did not
abuse its discretion in denying the defendant's
request for a sequestered voir dire. We see little
merit in defendant's argument that the answers
given by prospective jurors during voir dire served
to taint the entire venire. No information prejudicial to the defendant surfaced during voir dire.

[31] Note also that juror Hayden responded affirmatively to the trial
judge's question that she would be able to give the defendant all his
constitutional guarantees, but upon further questioning by the trial
judge, indicated that she would have a hard time being impartial,
because she had a daughter the same age as the defendant's daughter
who had found the body. Following this admission, she was excused
by the trial judge.

[32] We would caution that the problems inherent in juror self-assessment may be a function of the facts in the case. This can be
illustrated by contrasting the potential bias stemming from pretrial
publicity with the bias stemming from racial or ethnic prejudice.
While a person may feel little hesitation in admitting that his views
have been colored by extensive pretrial publicity, such a person may
become much more reticent about admitting to a deeply held racial or
ethnic prejudice. In this context, trial judges must be judiciously
skeptical of such self-declarations of impartiality. This is not to say
that potential bias stemming from pretrial publicity merits only
cursory attention; it is only to note that, in the pretrial publicity
context, the trial court must focus its concern on a juror's unwitting
bias. In the context of cases presenting other potential biases, the
trial court must seek also to uncover the juror's deliberately hidden
bias.

Only nine of the forty-three prospective jurors admitted having an opinion about the case. Mere admissions by less than one-quarter of the prospective jurors that they had formed an opinion and could not be fair, without more, cannot serve to taint the jury pool. We acknowledge that the absence of a sequestered voir dire in high publicity cases poses a risk of tainting the venire. This risk, however, is greatest when the pretrial publicity has included more prejudicial information.[33] A trial court confronted with *prejudicial* pretrial publicity must be sensitive to the potential taint of the venire engendered by responses during voir dire. It is in this situation that sequestered voir dire should be considered.

E

Finally, we would reject the Court of Appeals conclusion that the cumulative effect of the trial court's refusal to conduct sequestered voir dire, its prohibition of meaningful participation by defense counsel, and its failure to ask probing questions regarding media exposure served to deny defendant his right to a fair trial. We believe that neither the refusal to conduct sequestered voir dire nor the failure to submit defendant's proposed questionnaire to prospective jurors constitutes error requiring reversal. Additionally, we believe that the questions asked by the trial court were sufficiently probative; appellate counsel's attempt to premise error on the leading and superficial nature of the questions propounded fails to consider that such questions were the offspring of defense counsel's motion regarding the conduct of

---

[33] The classic paradigm of prejudicial information is the inadmissible confession. In this case, however, we are not presented with pretrial publication of an inadmissible confession.

voir dire. Finally, we would not conclude that the combination of these actions by the trial court establishes error requiring reversal.

V

### CONCLUSION

Accordingly, we would conclude that the trial court did not abuse its discretion in denying defendant's motions for a sequestered, individualized voir dire and for submission of a questionnaire to prospective jurors. We believe that the questions chosen by the trial judge to assess jurors' media exposure were sufficiently probative when considered in the context of defense counsel's motion expressing her belief that questions requiring a prospective juror to expound on the reasons underlying any opinions held served only to taint the panel. Lastly, we would conclude that the trial court did not err in allowing juror self-assessment of bias to go unchallenged, but rather, was in fact cognizant of such potential bias. Accordingly, we would reverse the decision of the Court of Appeals and remand for consideration of the issues previously briefed, but not yet addressed by that Court.

Riley and Griffin, JJ., concurred with Brickley, J.